# RHODE ISLAND INSURANCE COMPANY

## vs.

## BENJAMIN O. PHELPS.

*Fire Insurance—Iron Safe Clause—Waiver by Agent*
*Forbidden.*

The provisions of the "iron safe clause" in a policy of fire insurance being not only reasonable but also important and desirable for the protection of both parties to the policy, a non-compliance therewith will render the policy null and void, if it is so provided therein.                                      p. 369

A provision in the policy limiting the power of agents to waive conditions of the policy does not apply to conditions relating to the inception of the contract, nor to stipulations to be performed after a loss, but it does apply to provisions of the contract after it has gone into effect.                          p. 370

A provision that the insured will take a complete inventory of stock within thirty days after issue of the policy and once in each calendar year, that he will keep a complete set of books, and will keep the inventory and the books in a fireproof safe when the building is not open for business, involves conditions to be performed after the policy goes into effect, and is consequently subject to a provision limiting the power of agents to waive conditions of the policy.                          pp. 370-372

*Decided June 22nd, 1922.*

Appeal from the Circuit Court for Frederick County (URNER, C. J., and WORTHINGTON, J.).

Action by Benjamin O. Phelps against the Rhode Island Insurance Company of Providence, R. I. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Rowland K. Adams* and *W. Calvin Chesnut,* for the appellant.

*Alban M. Wood* and *Frank L. Stoner,* for the Appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a judgment recovered on a fire insurance policy issued to the appellee by the Rhode Island Insurance Company of Providence, R. I.

The policy, which was dated and issued on the 15th of November, 1920, insured the appellee against direct loss or damage by fire to the amount of $2,000

"on (as the first item) stock consisting principally of General Merchandise, Hay, Grain, Feed, Produce and Supplies, and on stock materials, * * * , the property of the insured * * * , all while contained in the frame, metal roof buildings and additions thereto adjoining and communicating, occupied as a Business Barn, situate at Ijamsville, Frederick Co., Md. Iron safe clause attached on first item," etc.

The iron safe clause referred to was a special rider attached to the face of the policy, and is as follows:

"Iron Safe Clause.

"Warranty to keep Books and Inventories and to produce them in case of loss.

"The following covenant and warranty is hereby made a part of this policy:

"1. The assured will take a complete itemized inventory of stock on hand at least once in each calendar year and, unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within 30 days of issuance of this policy, or this policy shall be null and void from such date, and upon demand of the assured the unearned premium from such date shall be returned.

"2. The assured will keep a set of books which shall clearly and plainly present a complete record of

business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory, as provided for in first section of this clause, and during the continuance of this policy.

"3. The assured will keep such books and inventory, and also the last preceding inventory, if such has been taken, securely locked in a fireproof safe at night, and at all times when the building mentioned in this policy is not actually open for business; or, failing in this, the assured will keep such books and inventories in some place not exposed to a fire which would destroy the aforesaid building.

"In the event of failure to produce such set of books and inventories for the inspection of this company, this policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon."

The policy also contained the following provision:

"This policy is made and accepted subject to the foregoing stipulations and conditions, and to the following stipulations and conditions printed on the back hereof, which are hereby specially referred to and made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of this company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement endorsed hereon or added hereto; and as to such provisions and conditions no officer, agent, or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached."

On the 20th of March, 1921, the "Business Barn" referred to in the policy, and its contents were destroyed by fire. Upon investigation after the fire the company discovered that the insured (appellee) had not complied with the iron safe clause of the policy, and promptly notified him, through its agent and adjuster, that it denied all liability under the policy on that ground, whereupon this suit was brought in the Circuit Court for Frederick County, where the trial resulted in a judgment for the plaintiff for $1,146.50, from which the company has brought this appeal.

At the trial, the plaintiff testified in part as follows: "Q. Did Mr. Thomas (the company's agent who issued the policy) at any time before the issuance of the policy talk to you about the iron safe clause? A. He asked me whether I had one; I told him I hadn't any; he said it would not require any for them. * * * Q. Was it Mr. Kennedy or Mr. Thomas you talked to? A. Mr. Thomas. Q. Mr. Guy Thomas? A. Yes, sir. I told him I was not going to keep any books in the safe; then he wrote the policy. Q. And he said it would be all right? A. Yes, sir." On cross-examination he testified: "Q. What conversation did you have with Mr. Thomas prior to the writing of the policy when you went to him? A. I told him what I wanted it insured. Q. What did you tell him you wanted to insure? A. I told him what I was putting in there and wanted it insured for $2,000. Q. What did you tell him you were putting in? A. Twenty-five tons of feed at that time and I had the corn already in there and other stuff. Q. You told him you wanted to insure for $2,000? A. Yes, sir. Q. What did he reply? A. He did not say a word, but he wrote it out. Q. That was all the conversation you had at that time? A. That was all outside of he asked me about this safe; I told him I did not have any, and he said that was all right. * * * Q. Did you take any inventory of the stock of goods you had in the barn? A. I knew what I had sold. Q. Did you take an inventory? A. No, sir. Q. Did you keep any books? A. No, sir. Q. Did you ever produce any

books or inventory, or offer to produce any to Mr. Gardner (the adjuster) or any agent of the insurance company after the fire? A. No, sir. Q. Ever make any effort to comply with the provisions of that policy known as the iron safe clause? A. I told him when I insured I wasn't going to keep any books until I opened the store. 'Q. Did you make any effort to comply with that clause of the policy? A. No, sir. * .* *. Q. Did this very policy you referred to on that store contain the iron safe clause? A. Yes, sir, the store did. Q. Was anything said by Mr. Thomas about the iron safe clause on that policy? A. I told him I wouldn't have any before April; I told him another thing; I did not expect to keep any books after I opened the store. * * * Q. Didn't the conversation about not keeping books and an inventory in compliance with the iron safe clause relate to the policy of insurance on the store and not to the policy of insurance on the business barn? A. I don't remember about it, I remember I gave him the policy back after the fire. Q. Answer the question please. 'This conversation that took place on November 15th, didn't that conversation about your not keeping books and taking an inventory relate to the policy covering your stock that you intended to put into the store rather than to the stock that was in the barn and destroyed? A. I may have said that, that that was the store policy. Q. (By the Court): The conversation you had with him about not keeping any books might have referred to the policy on the store goods instead of the policy on the barn? A. Yes, sir."

Mr. Thomas, when called by the plaintiff, testified that at the time he issued the policy sued on he called the appellee's attention "to the fact that it was necessary to comply with the conditions of the iron safe clause," and further testified: "Q. Do you recall what Mr. Phelps (the insured) told you during that conversation? A. No, I can't say that I do; just a general conversation we have with every policyholder. Q. Did or not Mr. Phelps tell you he did not have an iron safe? A. I think probably he did at the time. Q. Do you remem-

ber any conversation whether or not he had any books or intended to keep books? A. No, I do not." On "re-direct examination," in answer to the question, "I understand you to say in reply to my question that you did remember Mr. Phelps informing you he had no iron safe?" he said, "Yes, sir," and then on "re-cross examination" he further testified as follows: "Q. With reference to that last question, did you tell Mr. Phelps that he could comply with this provision of the policy by keeping his inventory and books in some place not exposed to the same fire hazard that the insured property was? A. Yes, sir."

The declaration alleged that the company issued the policy in question; that the property was destroyed by fire; that the plaintiff furnished proofs of loss, and that the plaintiff had complied with all of the terms and conditions of said policy of insurance "on their (his) part to be performed," and at the conclusion of the evidence, the defendant offered a number of prayers which sought to withdraw the case from the jury on the grounds, (1) that under the pleadings the plaintiff had offered no evidence legally sufficient to entitle him to recover; (2) that the uncontradicted evidence shows that the plaintiff failed to comply with the provisions of the policy in the iron safe clause, and (3) that there was no evidence legally sufficient to establish a waiver of the conditions of the policy contained in said clause. The second exception in the record is to the rejection of those prayers.

It is conceded that the appellee entirely failed to comply with this clause of his policy, and it is said in the brief of his counsel that he "rested his case (in the court below) on the proof that said 'iron safe clause' had been waived by the duly authorized agent of the company at the time of the inception of the contract, the issuance and delivery of the policy and the receipt of the premium therefor."

We have set out at some length the evidence bearing upon the question of waiver, all of which relates to a conversation between the company's agent and the insured *at the time the*

*policy was issued,* in order to show the character of the proof upon which the appellee relies. It was said in *Crook* v. *New York Life Ins. Co.,* 112 Md. 282: "To establish the waiver the plaintiff was bound to prove acts, declarations, or conduct on the part of the insurer inconsistent with the intention to insist upon a performance of the conditions of the policy," and it seems that the only *definite* proof in this case is that the insured told Mr. Thomas that he did not have an iron safe, that Mr. Thomas said that an iron safe was not required, and told him that he could "comply with the provisions of the policy by keeping his inventory and books in some place not exposed to the same fire hazard that the insured property was." We are not to be understood, however, as passing upon that feature of the case, but simply refer to it in approaching the broader and more important question, whether such acts, statements, or conduct as are attributed to the agent of the company constitute, under the terms of the policy, a waiver of the conditions and provisions of the iron safe clause.

In *Reynolds* v. *German Amer. Ins. Co.,* 107 Md. 115, CHIEF JUDGE BOYD, referring to the iron safe clause, and quoting from 13 *Am. & Eng. Ency. of Law,* 355, said: "While there was at first some disposition to ignore the clause when it was attached merely in the form of a rider and knowledge of it was not brought home to the insured, it has now become well settled by adjudications which have multiplied rapidly during the few years of its existence that this clause is not only reasonable but even desirable." After stating that the insured had not complied with the clause by taking an inventory ten days after the time specified, he said further: "In this case there is no ambiguity, and there can be no question about what was intended by the parties. As we have seen, the weight of authority is not only to the effect that such a provision as that under consideration is valid, but it is said to be *desirable.* When then the parties entered into the contract, embraced in the policy, and ex-

pressly agreed that the policy should be null and void, unless an inventory was taken as therein required, there could be no justification for the Court setting aside the terms of the contract, because the insured, subsequent to the thirty days, did what he was required to do within that time, in order to keep the policy in force." In the case of *Joffe* v. *Niagara Fire Ins. Co.,* 116 Md. 160, where recovery was denied because of the failure of the insured to comply with section 3 of the clause, CHIEF JUDGE BOYD said: "Such a clause in an insurance policy should undoubtedly receive 'a fair and reasonable interpretation' as the authorities have frequently said of it," and in the case of *Miller* v. *Home Ins. Company,* 127 Md. 145, this Court, speaking through JUDGE URNER, said: "The importance of this and other provisions of what is commonly called the 'Iron Safe Clause' of insurance policies is plainly apparent and has been repeatedly emphasized. The effect of such a covenant, if duly observed, is to safeguard the interests of both parties to the contract. * * * The failure of the appellant to produce the books for which the policy provides being chargeable to his default in the performance of his contractual duty to keep such records, there is no ground upon which we can properly refuse to enforce the covenant that the non-production of the books shall be a bar to recovery on the policy and shall render it null and void."

As the provisions of the iron safe clause are not only reasonable, but are important and desirable for the protection of the interests of both parties to a policy like the one sued on, and the failure of the insured to comply with them renders the policy null and void, it only remains to be determined whether they were waived by the acts or declarations of Mr. Thomas, the agent of the company.

The contract provided that "no officer, agent or other representative of the company shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement endorsed hereon or added hereto; and as to such provisions and condi-

tions no officer, agent or representative shall have such power or be deemed or held to have waived such provisions or conditions unless such waiver, if any, shall be written upon or attached hereto," &c.   In the case of *Bakhaus* v. *Caledonian Ins. Co.,* 112 Md. 685, this Court said: "It has been repeatedly held in this State that provisions in policies limiting and restricting the power of agents to waive the conditions of the policy * * * do not refer to stipulations to be performed after a loss," and in *Dulany* v. *Fidelity & Cas. Co.,* 106 Md. 17, and *Goebel* v. *German American Ins. Co.,* 127 Md. 419, the Court held that such limitations and restrictions do not apply to conditions that relate to the inception of the contract, but to provisions of the contract after it has gone into effect. The same rule is stated in 26 C. J. 292, sec. 365b, and see also *Bakhaus* v. *Caledonian Ins. Co., supra,* at pp. 698 and 699. None of the provisions in the iron safe clause related to the "inception of the contract" in this case, and only the last paragraph of that clause could be construed to contain "stipulations" that were to be performed after a loss had occurred. On the contrary, sections 1, 2 and 3 of the clause contained only such conditions as were to be performed after the policy went into effect, which, in *Reynolds* v. *German Am. Ins. Co., supra,* and 26 C. J. 250, are said to be upheld as "promissory warranties."

Now, allowing the evidence relied on by the appellee the most liberal construction of which it is susceptible, it all relates to what was said by the insured and the company's agent at the time the policy was executed in reference to the performance by the insured of the terms and conditions of the policy that were to be complied with after it went into effect, and under the provision of the policy limiting the power of the agent to waive its conditions, and the Maryland decisions to which we have referred, it was clearly not sufficient to establish a waiver of the requirements of the iron safe clause of the contract.   In the case of *Crook* v. *New York Life Ins. Co., supra,* the policy contained the following pro-

visions: (1) "Only the president, a vice-president, the actuary, or the secretary has power on behalf of the company to make or modify this or any contract of insurance, or to extend the time for paying any premium, and the company shall not be bound by any promise or representation heretofore or hereafter given by any person other than the above." (2) "Premiums are due and payable at the home office, unless otherwise agreed in writing, but may be paid to any agent producing receipts signed by one of the above named officers and countersigned by the agent. If any premium is not paid on or before the day when due, or within the month of grace, the liability of the company shall be only as hereinbefore provided for such case." In reference to them JUDGE BURKE, speaking for this Court, said: "These provisions constituted a part of the policy, and Mr. and Mrs. Crook were chargeable with notice of them, and it cannot be doubted that under these provisions Mr. Knott, the casher, had no power or authority to waive any of the provisions of the contract."

Counsel for the appellee rely upon the cases of *Dulany* v. *Fidelity & Cas. Co., supra,* and *Goebel* v. *German American Ins. Co., supra.* But an examination of these cases will show that the provisions therein held to have been waived related to the inception of the contract, and not to the performance of its terms after it was executed. In *Dulany's Case,* the defense relied on a false answer to a question attached to the policy, and declared to be a warranty. The Court held that the applicant was entitled to show what answer he actually made to the question, and that the agent told him to write the answer as it appeared, and the Court said (quoting from the syllabus): "The provision in a policy that no agent has authority to change it or to waive any of its provisions, relates to stipulations of the contract itself, after it has gone into effect, and does not apply to conditions concerning the inception of the contract, when it appears that the agent delivered the policy and received the premiums with full knowledge of the facts of the case." In *Goebel's Case,* the

Court was dealing with a provision requiring the property to be occupied, and it appeared that at the time of the renewal of the policy the company's agent knew that the property was unoccupied, and had been for a long time prior thereto, and the Court said: "It is a just and settled rule that an insurance company which issues a policy, and collects premiums thereon, with actual or imputed knowledge that warranties contained in it are contrary to the real facts, will not be permitted to defeat recovery by the insured on the ground that the conditions thus stipulated did not exist."

In view of the decisions referred to of this Court, which are in accord with many well considered cases in other jurisdictions, we need not discuss the other cases cited by the appellee. It follows from what has been said that the case should have been withdrawn from the jury, and that the judgment must, therefore, be reversed without awarding a new trial. In this view of the case it becomes unnecessary to consider the other exception in the record.

*Judgment reversed, with costs, without awarding a new trial.*