## EUREKA-MARYLAND ASSURANCE CORPORATION *v.* SAMUEL ET AL., EXECUTORS

[No. 30, October Term, 1948.]

604

*Decided December 8, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Jacob S. New* and *J. Cookman Boyd, Jr.*, with whom was *Henry M. Decker, Jr.*, on the brief, for the appellant.

*Hilary W. Gans*, with whom was *J. B. Randol Carroll* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Eureka-Maryland Assurance Corporation (Eureka), appellant, from a judgment rendered against it, on a verdict by a jury, in a suit on a life insurance policy in the Superior Court of Baltimore City in favor of Sara S. Samuel, *et al.*, executors under the Last Will and Testament of Albert Herman Samuel, deceased, appellees.

This case has been tried twice below, first, before Judge Emory Niles and a jury, resulting in a verdict for the plaintiffs. After that verdict a new trial was granted. The second trial before Judge Tucker and a jury resulted in a verdict for the plaintiffs. A motion for judgment *non obstante veredicto* having been overruled and a new trial refused, an appeal is taken to this Court.

The Sudbrook Realty and Insurance Agency, Incorporated, of Baltimore City was a general agent for the appellant. One Joseph I. Cohen was a sub-agent acting for that general agent but with his own individual office. Mr. T. J. Mohan, who was president of the Sudbrook Agency, was also a vice-president of Eureka.

Mr. Albert H. Samuel, president of Kingsbury-Samuel Company of Baltimore, signed an application for life insurance with the appellant corporation through Mr. Joseph I. Cohen, its agent, on the 2nd day of March, 1944.

As a result of that application, on March 22, 1944, a life insurance policy on the life of Albert Herman Samuel in the amount of $10,000 payable to the estate of Samuel was executed by the officials of Eureka. Mr. Cohen, its agent, obtained this policy directly from the appellant corporation. He advised Mr. Samuel that he had the policy and made a luncheon engagement with him at the May Company Lunch Room for Saturday, April 29, 1944. Mr. Samuel now being deceased, and there being no witnesses present, the only testimony as to what occurred at that luncheon is that of Mr. Cohen, the agent of Eureka, who related substantially the following.

Mr. Cohen explained the provisions of the policy to Mr. Samuel and the policy was approved by Samuel, who said: "all right, when can we expect the other two". The reference to "the other two" was to two other insurance policies which Mr. Samuel's company was taking through Mr. Cohen in another insurance company, and those policies have nothing to do with this case. Mr. Cohen then testified: "I pointed out to Mr. Samuel that even though he had approved the policy and was satisfied, to make sure that the policy was in effect and there would be no doubt about it, that I would like him to pay me at least some portion of the annual premium; if necessary we could change it to semi-annually, quarterly, or what not, whereupon he gave me some money. * * *" He further said he told Samuel "that the policy was not considered in effect until the applicant had shown that he had definitely made up his mind by paying in some money and urged him to do so. He laughed and made some remark to the effect that 'all insurance agents are alike; they are all always drawing up the hearse,' and he never felt better in his life, but if I wanted it, all right, whereupon he gave this sum of money." Samuel gave him $100 of which Cohen allocated $70 to this policy. Samuel wanted to know whether that would be sufficient and Cohen assured him that $70 was sufficient to put the policy in force. He gave Samuel the policy and sometime before they separated at luncheon, Samuel said to

Cohen: "There is no need of me taking this and putting it in my safe deposit box and then in a week or two having to go and get it out and hand it back to you after my lawyer tells me how to change it. Suppose you keep it until we are ready." Cohen said Samuel "made an appointment with me for the 15th to make those changes and to settle in full on the whole—all of the matters that we had been discussing." The change in the policy was to have been a change of beneficiary.

After this luncheon meeting Cohen attempted immediately to contact the Sudbrook Agency where the records of payment were kept. It being Saturday afternoon, he was unable to contact anyone there. On Monday morning, May 1, 1944, he telephoned Mr. Kruger, the manager of the Sudbrook Agency, and told him that he had the $70 from Mr. Samuel and asked him how he wanted to handle it because he and Samuel "had it definitely understood" that Cohen had been paid enough money "certainly to put the policy into effect on a quarterly basis". Cohen said: "I asked him (Kruger) how he wanted me to handle it, that I would get payment for one year on the 15th, and he told me that would be all right, that it would be in effect and that I could settle for one year on the 15th." He said Kruger told him that it would not be necessary for Samuel to pay any additional money until the 15th of May, 1944, and Kruger assured him that the policy would be in effect and that the simplest way to handle the matter would be to settle for the annual premium on the 15th. Cohen further testified he was entitled to 60 per cent commission on the first premium and he "invariably" paid the net amount to the insurance company and kept his commission. The annual premium was $535.10. There is no doubt that the $70 paid was sufficient to pay the quarterly premium on the policy, less Cohen's commission. At one time in his testimony Cohen stated that he did not recall whether he (Cohen) offered definitely to pay the whole premium or not. He later testified definitely, however, that he told Mr. Kruger he had collected $70, wanted the policy in effect and that

he was ready to do whatever was necessary to put that policy definitely in effect. He said he told Kruger "if he required either seventy dollars, or if he wanted to change it to a quarterly premium, which is permissible without any home office formality, or if he wanted the full annual premium or anything like that, it was up to him, I would do whatever was necessary." He later repeated this testimony in the following words: "I told him that I had seventy dollars, that I would handle it either as quarterly premium if he wanted to change it that way, or anyway that he wanted. If he insisted on the annual I would send him my check. * * * I phoned the general agent of the Eureka, Mr. Kruger, and explained I had part payment, more than enough for one month, $70.00—in as much as the whole year's premium was only five hundred and some dollars, seventy dollars was more than enough. * * * I was willing to do it on any basis he wanted. It was enough for the whole monthly premium; it was enough for the quarterly as far as he was concerned."

Paul C. Kruger, the manager of the Sudbrook Realty and Insurance Agency, stated that Cohen called him and told him that he would get the money from the Samuel Company on the 15th of the month. He said there was nothing mentioned about the insurance being in force at any time. He denied that Cohen told him that it was necessary to put the policy in force immediately and said the first he knew of any payment by Samuel to Cohen was after Samuel's death.

Samuel died of a heart attack on May 12, 1944, without paying any money other than the $70 on the insurance policy. Mr. Cohen does not know whether he gave Samuel a receipt for this $70 or not. The insurance company refuses payment of the policy, hence this suit.

In this case the trial judge gave an oral charge to the jury. The appellant claims that the judge erred, after the presentation of evidence, in refusing to instruct the jury that there was no legally sufficient evidence in the case to entitle the plaintiffs to recover. The application

signed by Samuel contained the following clauses: "2. That except as otherwise stated in the form of receipt hereto attached there shall be no contract of assurance until a policy shall have been issued and delivered to me and the first premium paid thereon during my lifetime and continued good health and that such delivery and payment shall constitute acceptance of the policy as issued; * * * 4. That only an Executive Officer of the Corporation has authority to make or alter a contract of assurance or to bind the Corporation by any promise or statement." The policy of insurance here contained the following provisions: "* * * This Policy shall not take effect unless nor until the first premium shall have been paid during the continued good health of the Assured. * * * Modification. No modification or alteration hereof or endorsement hereon will be valid unless made by the President, a Vice-President, the Secretary or the Actuary of the Corporation, and no other person has power on behalf of the Corporation to make, modify or discharge this Policy contract. Agents have no power to waive or modify any of the terms or conditions of this Policy, or to extend the time for the payment of any premium, or to bind the Corporation by making any promise not contained in this Policy, or by accepting any representation or information not contained in the application for this Policy." Judge Tucker held that Clause 4, *supra*, in the application justified the applicant, Samuel, in believing that it referred to the issuance of the policy and alterations in it and promises and statements after its issuance, "and not to the inception of the policy", and for that reason refused the demurrer prayer.

We, however, are of opinion that the language in the application was sufficient to put Samuel on notice that Cohen alone could not make the policy effective without payment of the first premium or change the application from an annual basis to a quarterly basis. On the other hand there is no doubt that in this State a restriction in an insurance policy, and not in the application for the policy, upon the power of the agent to waive any condition unless

done in a particular manner cannot be deemed to apply to those conditions which relate to the inception of the contract, when it appears that the agent has delivered it and received the premiums with full knowledge of the actual situation existing. *Franklin Fire Ins. Co. v. Chicago Ice Co.*, 36 Md. 102, 11 Am. Rep. 469; *Maryland Fire Ins. Co. v. Gusdorf*, 43 Md. 506, 514; *Ben Franklin Ins. Co. v. Gillett*, 54 Md. 212, 218; *Continental Ins. Co. v. Ruckman*, 127 Ill. 364, 20 N. E. 77, 11 Am. St. Rep. 121; *Hartford Fire Ins. Co. v. Keating*, 86 Md. 130, 147, 38 A. 29, 63 Am. St. Rep. 499.

It was said in the case of *Bitting v. Home Ins. Co.*, 161 Md. 56, at page 61, 155 A. 329, 332: "And it has repeatedly been held by this court that provisions in a policy which deny to the agent the power to waive any of its conditions have no application to acts done or statements made at its inception (*New York Life Ins. Co. v. Rogers*, 156 Md. [88], 92, 143 A. 651; *Dulany v. Fidelity & Cas. Co.*, 106 Md. [17], 34, 66 A. 614; *Forwood v. Prudential Ins. Co.*, 117 Md. [254], 260, 83 A. 169; *Hartford Fire Ins. Co. v. Keating*, 86 Md. 130, 38 A. 29, 63 Am. St. Rep. 499), and in themselves impose no limitation upon the agent's authority to bind his principal by representations material to the negotiation of the policy made before the issuance thereof." See also *Rhode Island Insurance Co. v. Phelps*, 141 Md. 362, 370, 118 A. 749.

However, in the instant case, the restriction "that only an Executive Officer of the Corporation has authority to make or alter a contract of assurance or to bind the Corporation by any promise or statement" is contained in the application for the life insurance policy signed by Samuel and accepted by the corporation. Such an application apparently has never before been before this Court for interpretation as herein necessary.

In the case of *Drilling v. New York Life Ins. Co.*, 234 N. Y. 234, 137 N. E. 314, 315, (Court of Appeals of New York, November 21, 1922), the application for life insurance contained the provision that the insurance should not take effect unless the first premium was paid and the

policy was delivered to and received by the applicant during his life time and good health. It also contained the provision "that only the president, a vice president, a second vice president, a secretary, or the treasurer of the company can make, modify, or discharge contracts, or waive any of the company's rights or requirements, and that none of these acts can be done by the agent taking this application." In that case Drilling signed such an application with the company's agent, Rose Stedman. The agent later received the policy and on September 13, 1917, took it to the applicant's home to deliver it. The applicant was financially unable to take up the policy because he had not sold his wheat crop. The agent then told him: "Never mind; you can have it anyway. * * * I told him * * * I would get the money at the bank and pay for them; and he said, 'Well, if you will do that, I will pay you interest.'" After this arrangement, the agent left the policy with Drilling. This insurance agent had a son who was a doctor. On the evening of the 13th of September, the day the policy was delivered, that doctor was called to attend the insured. He went to see him the next day and found him sick of erysipelas, of which disease Drilling died eight days thereafter on September 22, 1917. That doctor attended the sick man every day from the 14th to the 21st of September, inclusive, and sometimes as often as two or three times a day. The day the doctor first visited Drilling, September 14, 1917, the first premium on the policy had not been paid as the agent had no money with which to pay the premium as she had undertaken to do. Before the 17th of September, she arranged with a bank to procure a loan and sometime between the 14th and 17th of September, sent her check to the company's office for the amount of the premium less her commissions. The check was dated September 14, 1917, and was received at the company's office on the 20th or late in the afternoon of the 19th of September. The agent was not sure of the date on which she sent the check. She said that it might have been the 14th or 15th, but she was

positive that she sent it before the 17th. Doctors, who testified in the case, stated that if erysipelas was apparent on September 14th, it must have existed for twenty-four hours before, or on September 13th. The Court found in that case that there was no waiver of the condition in the application that the premium should be paid while the insured was in good health.

The Court there went further and held that the agent had no power or authority to waive any of the two conditions herein set forth, or agreements in the written application, and she could not modify or discharge the contract or waive any of the company's rights or requirements thereunder and she therefore had no power to waive the payment of the first premium while the insured was in good health. The Court there also pointed out that these conditions were contained in the application and that Drilling, when he put his name to that application, knew the local agent had no power to waive the provision that the insurance policy, thereafter to be delivered, would not take effect until the first premium was paid while he was in good health. Further, that the Court must assume that he made the contract with the company with the full understanding that there would be no insurance on his life until the premium was paid by him or for him while he was in good health. The fact that the agent may have paid the premium, knowing that the applicant was in ill health, could not therefore constitute a waiver of this agreed limitation upon her authority to waive. The Court there further pointed out that if this could have been done by the agent no contract could ever be made by an insurance company limiting the power of an agent. The Court said: "Surely the doing of an act cannot of itself waive an agreement that it should not be done." Finding that the agent had no authority to waive any of the provisions of the application, the Court of Appeals of New York, in an opinion by Judge Crane, reversed the judgments of the court below and dismissed the case. This opinion was concurred

in by Judges Hiscock, Hogan, Cardozo, Pound, McLaughlin, and Andrews. See cases there cited.

We agree with the reasoning of the New York court in that case and therefore hold that the learned trial judge was in error in holding that the limitation in the application justified Samuel in believing that it referred to the issuance of the policy and alterations in it and promises and statements after its issuance, and not to the inception of the policy. One of the cases relied on in the Drilling case was *Lycoming Fire Ins. Co. v. Langley*, 62 Md. 196. See also *Newsom v. New York Life Ins. Co.*, 6 Cir., 60 F. 2d 241, 243; *Vance on Insurance*, 2d Ed. 434; *Richards on Insurance*, 3d Ed., sec. 162, page 197, note 2; *Penn Mutual Life Ins. Co. v. Blount*, 165 Ga. 193, 140 S. E. 496. We are of opinion, as was held in the *Drilling* case, that Samuel, when he signed the application, was on notice that Cohen, not being an executive officer of the corporation, had no authority to bind the corporation by any promise or statement. *Metropolitan Life Ins. Co. v. Samis*, 172 Md. 517, 526, 192 A. 335. The question whether Samuel believed from Cohen's statement to him that the policy would become effective at once, and whether Samuel believed that Cohen had authority to speak for the company should therefore not have been submitted to the jury as was done in the instant case. Therefore the judgment here must be reversed.

However, we think that there was sufficient evidence to present this case to the jury on other questions.

In the case of *Travelers' Ins. Co. v. Melman*, 147 Md. 459, 128 A. 125, 127, the application for insurance provided in part: "That the contract issued hereupon shall not take effect unless the first premium shall be actually paid while I am in good health." There was also a limitation in the policy but not in the application that "No agent can make, alter or discharge this contract or extend the time for payment of premiums, nor can this contract be varied or altered or its conditions waived or extended in any respect, except by the written agreement of the

company, in compliance with the law of the state in which the contract is issued, signed by the President, or one of the Vice Presidents or Secretaries, whose authority will not be delegated." Melman signed such an application for a twenty year endowment policy in the sum of $5,000. The policy was executed by the company, delivered to its agent and by him delivered to Melman. There was testimony that the applicant had sufficient money to pay the premium and offered to do so but the agent, however, told the applicant that he need not hurry about paying the premium, that the agent would pay it and the applicant was protected. It was said by this Court in that case: "It is to be remembered that insurance companies must of necessity deal with the public in the transaction of the business in which they are engaged entirely through agents, and perhaps in a majority of cases through subordinate agents, certainly seldom with the principal officers of the company, and slightly less seldom with general managers or general agents. The subordinate agents thus dealing with the public are selected by the insurance companies, and by their actions must be held to bind their principals not only within the scope of their real and actual authority, but also within the scope of their apparent authority. The enormous volume and variety of business engaged in by insurance companies at the present time, of necessity, requires them through their agents to deal with people of every condition and walk of life, many of them uneducated and illiterate; and, when an insurance agent solicits a contract of insurance from a prospective purchaser, he frequently has to explain, during the course of his negotiations, what insurance is, what the purpose of the contract is, what protection it affords to the insured and his family in case of death, the amount of and when the premiums are to be paid, and to impart much other information concerning the contract, in order that the prospective purchaser may understand and appreciate the benefits to be derived from a policy of insurance. The insured rarely comes in contact with any officer or high official of the company, and can only know what the company proposes, and what

he himself is to do, by reason of what he is told by the agent. It is therefore necessary, in order to insure fair, equitable, and just dealings between insurance companies and their policy holders, that the law of principal and agent be liberally interpreted by the courts in favor of the insured, and that the agent be held to have had all of the authority which it was apparent to the insured he possessed. * * *" *Mutual Fire Ins. Co. v. Eicholtz,* 88 Md. 92, 40 A. 706; *Mallette v. British-American Assurance Co.,* 91 Md. 471, 46 A. 1005; *Goebel v. German American Ins. Co.,* 127 Md. 419, 427, 96 A. 627; *Alexander v. Continental Ins. Co.,* 67 Wis. 422, 427, 30 N. W. 727, 58 Am. Rep. 869. "In Fourth Edition of *May on Insurance,* vol. 2, § 345, the author states: 'The tender of payment will be equivalent to the actual payment in its effect upon the obligations of the policy'; citing *New York Life Insurance Co. v. Colpton,* 7 Bush, Ky., 179, 3 Am. Rep. 290; *New York Central Insurance Co. v. National Protection Insurance Co.,* 20 Barb., N. Y. [468], 469. The same author, in section 345 of the volume referred to, says: 'Tender is, of course, sufficient to avoid forfeiture, if in proper time and form.' We think the delivery of the policy to the insured, together with the tender of the amount of the premium to the agent by the insured, which was refused by him with the statement that the insured was protected and that he was good for the premium and need not be in a hurry, was such payment to the agent as would render the policy enforceable. *If the insured had tendered the payment to the general manager of this company in Baltimore City and had been told by that official what he was told by the agent in this case, there can be no doubt that the policy would have from that time been in force; not because the official had the authority to waive provisions of the policy, but because such tender would have constituted payment to the company.* We therefore hold that the tender to the agent, under such circumstances as are shown in this case, constitutes payment." (Italics supplied here.) See also 118 A. L. R. 1073; *Helen Miller v. Brooklyn Life Ins. Co.,* 12 Wall. 285, 79 U. S. 285, 20 L. Ed. 398.

In the instant case there is testimony that Cohen, the agent of the appellant, called Kruger, the general manager of the general agency, the president of which was also a vice-president of appellant corporation, and told Kruger he had collected $70 from Samuel, he wanted the policy in effect and offered, if Kruger insisted, to send him a check for the annual premium. Cohen said he was assured by Kruger that it would not be necessary for any additional money to be paid until May 15, 1944, and that the policy would be in effect. If payment was tendered to the general agency, the president of which was a vice-president of appellant corporation, that executive officer had not only authority to bind the corporation, but tender to that agency "constituted payment to the company". We therefore are of opinion that the question whether payment was tendered to Kruger and refused by him should have been submitted to the jury.

There is also testimony here that the general manager of the general agency, the president of which was also the vice-president of appellant corporation, agreed to the acceptance by Cohen of the $70 as a quarterly premium. If this change in the payment of premium was accepted and agreed to by that general agency it also "constituted payment to the company". *Travelers' Ins. Co. v. Melman, supra,* and cases herein cited. We therefore think there was sufficient evidence in this case for the jury to pass upon the question as to whether Kruger ratified the acceptance of $70 by Cohen from Samuel as the initial quarterly payment on the policy thereby making it immediately effective.

Although not contradicted, we also are of opinion that the trial judge was correct in submitting to the jury the question whether Mr. Cohen received $70 from Mr. Samuel for the purpose of making the policy immediately effective, and also the question whether Mr. Samuel asked Mr. Cohen to keep the policy for him, there being sufficient evidence for the jury to pass upon these questions.

*Judgment reversed, with costs, and new trial awarded.*