36 A.3d 985

**COLUMBIA TOWN CENTER TITLE COMPANY, et al.**

v.

**100 INVESTMENT LIMITED PARTNERSHIP, et al.**

No. 0915, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 2, 2012.

See also 355 F.3d 759.

64

Richard Hagerty, McLean, VA (Tameka M. Collier, Washington, DC, Troutman Sanders, LLP, on the brief), for Appellant.

James Carbine, Baltimore, MD, for Appellee.

Panel: MEREDITH, ZARNOCH and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KENNEY, J.

This appeal has its genesis in the conveyance of a 1.145–acre parcel of land (the "Parcel") to two different purchasers, the second of which is appellee, 100 Investment Limited Partnership (the "Partnership"). Cambridge Title Company ("Cambridge") and, later, Columbia Town Center Title Company ("Columbia") were engaged by the Partnership in connection with two separate purchase transactions involving the Parcel. Neither Cambridge nor Columbia (collectively the "Title Companies") discovered and reported the prior conveyance to the Partnership. Both title companies, as agents of different title insurance companies, issued policies of title insurance insuring title to the Parcel. Years later, after having purportedly conveyed the Parcel to others, the Partnership learned of the prior conveyance, and purchased the Parcel at its then fair market value to cure the title defect in its prior conveyances and thereby confirm title in its grantees.

The Partnership brought a negligence suit in the Circuit Court for Howard County against Cambridge, Columbia and Chicago Title Insurance Company ("Chicago Title") for damages incurred in purchasing the Parcel. The circuit court found that Cambridge and Columbia had negligently performed the title searches and that Chicago Title was vicariously liable for their negligence.

Appellants, Cambridge, Columbia and Chicago Title, present the following questions, which we have slightly reworded:

1. Did the circuit court err in finding that the Partnership had a cognizable negligence claim for breach of duties owed to it by Cambridge and Columbia?

2. Did the circuit court err in finding that the Partnership satisfied its burden of proof for the elements of a negligence claim?

3. Did the circuit court err in finding that Chicago Title was vicariously liable for the negligently performed title searches of Cambridge and Columbia?

For the following reasons, we shall reverse the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On August 24, 1982, Frances and Mildred Miller (the "Millers") conveyed the Parcel to Ashan Khan, M.D., P.A., Profit Sharing Plan ("Dr. Khan"). That conveyance was properly recorded in the land records of Howard County. On October 14, 1986, the Parcel was included in a conveyance to the Partnership as part of a 49.845–acre parcel (the "Miller Tract"). In conjunction with that purchase, Cambridge issued a policy to the Partnership, underwritten by Chicago Title, pursuant to an agency agreement between Cambridge and Chicago Title, that did not reflect the prior conveyance to Dr. Khan. Cambridge later went out of business.

Shortly thereafter, in conjunction with a transfer of ownership interests in the Partnership, Columbia, at the request of the Partnership, issued a policy of title insurance for all land purportedly owned by the Partnership including the Parcel. That policy, which was underwritten by Safeco Title Insurance Corporation ("Safeco"), was issued on December 18, 1986, pursuant to an agency agreement between Columbia and Safeco. It took no exception for the prior conveyance to Dr. Khan. When Safeco subsequently merged with Chicago Title, Chicago Title became responsible for the Safeco title insurance policy.

In 1994, the Partnership subdivided the Miller Tract— including the Parcel—for residential development. Howard County approved the subdivision plan, and on March 1, 1995, the Partnership executed and recorded a Declaration of Covenants, Easements, Charges and Liens in connection with the development. During the subdivision process, the Partnership dedicated a portion of the Parcel as a public utility easement.

On July 7, 1995, the Partnership conveyed part of the Parcel to NVR Homes, Inc. ("NVR"), as part of five townhouse lots, which NVR later improved and conveyed to individual homeowners. The Partnership conveyed the remainder of the Parcel to Lynwood Association, Inc. ("Lynwood") on August 30, 1995. As a result of these conveyances, the Partnership no longer had any interest in the Parcel.

On July 26, 2001, the Partnership learned of the prior conveyance of the Parcel when Dr. Khan agreed to sell land, including the Parcel, to 100–103 Center, LLC, and Courtyards at Timbers, LLC (collectively "Timbers"). In connection with that sale, Timbers engaged a surveyor who discovered townhouses located on a portion of the land that Dr. Khan was selling. Timbers contacted the Partnership and informed it of the impending sale.

To cure any title defect in its prior conveyances, the Partnership negotiated with Timbers to purchase the Parcel from Timbers after Timbers' purchase from Dr. Khan was complete. The Partnership bought the Parcel from Timbers for $175,348.56.[1] The Partnership also incurred $16,162.32 in associated expenses, including costs and attorney fees, for a total cost of $191,510.88. Litigation ensued.

On March 15, 2002, Dr. Khan filed a complaint for trespass against the Partnership in the District Court for Howard County ("Khan Litigation"). *Khan v. 100 Inv. Ltd. P'ship*, No. 1001000013442002 (D. Ct. Howard Cnty.). The District Court entered judgment for Dr. Khan, awarding nominal damages of one dollar ($1.00). *Id.*

On April 5, 2002, Chicago Title filed a suit for declaratory judgment in the United States District Court for the District of Maryland, naming the Partnership as defendant, and asking the court to determine Chicago Title's responsibilities under the title insurance policy issued on December 18, 1986.[2] The federal district court granted summary judgment for the Partnership, awarding $201,744.37 in damages for the cost of purchasing the Parcel and for costs associated with the Khan Litigation. *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, No. JFM–02–CV1138 (D.Md.).

---

1. In purchasing the Parcel from Timbers, the Partnership paid the same price per acre as Timbers paid Dr. Khan. The circuit court found the repurchase price to be "fair market value."

2. The Partnership also filed a counterclaim for negligence that was dismissed without prejudice and not addressed in the federal litigation.

Chicago Title appealed to the United States Court of Appeals for the Fourth Circuit, which reversed in part and affirmed in part. *Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship*, 355 F.3d 759, 766 (4th Cir.2004). The federal appellate court determined that, under the terms of the policy, Chicago Title was under no obligation to compensate the Partnership for the cost of purchasing the Parcel. *Id.* The court reasoned that the instruments of conveyance by the Partnership contained, at most, a special warranty "promising only that [the Partnership] had not itself created any defect in title," *id.* at 764, and that Chicago Title's duty to defend was limited to claims made against the Partnership for loss or damage occurring prior to the time it conveyed its interest in the Parcel. *Id.* at 762. Therefore, Chicago Title was only liable for the costs associated with the Khan Litigation based on the trespass that occurred while the Partnership had title insurance coverage for the Parcel. *Id.* at 766. Accordingly, Chicago Title indemnified the Partnership for its legal fees and expenses incurred in defending the suit brought by Dr. Khan and the nominal damages awarded. Chicago Title also defended the Partnership in a suit brought by NVR, which was ultimately dismissed in favor of the Partnership.

On April 7, 2004, the Partnership filed a complaint in the Circuit Court for Howard County against Dewberry & Davis, LLC ("Dewberry"), Cambridge, Columbia, and Chicago Title alleging negligence claims against Dewberry arising from its survey; against Columbia and Cambridge for their failure to discover and report the Khan Deed; and against Chicago Title based on vicarious liability for the negligence of the Title Companies. It later amended the complaint to include a breach of contract claim against Columbia. On March 10, 2005, the circuit court granted summary judgment in favor of Dewberry, Cambridge, Columbia, and Chicago Title, finding that, as a matter of law, the doctrine of collateral estoppel barred the action because the same factual issues had been decided in the Fourth Circuit decision and the Partnership had not stated a cause of action for negligence because any act

of negligence by the Title Companies was not the proximate cause of the Partnership's damages.

The Partnership appealed only the judgments in favor of the Title Companies and Chicago Title to this Court, presenting the following questions:

1. Did the trial court err by holding that the decision of the United States Court of Appeals for the Fourth Circuit in *Chicago Title Insurance Company v. 100 Investment Limited Partnership*, 355 F.3d 759 (4th Cir.2004) barred Appellants' claims under the doctrine of collateral estoppel?

2. Did the trial court err by holding that Appellee's negligence, as a matter of law, was not the proximate cause of Appellants' damages?

*100 Investment L.P. v. Columbia Town Center Title Co.*, No. 2214, slip. op. at 1 (Md.Ct.Spec.App. March 8, 2007).

In an unreported opinion, we determined that the declaratory judgment action in the federal court did not bar the suit because that action only concerned the contractual rights of the parties under the Safeco policy and the state suit was founded in tort, *id.* at 9–12, and, if the Title Companies were found negligent, whether that negligence was the proximate cause of the Partnership's damages was a question of fact for the jury. *Id.* at 19–20. We reversed the circuit court's grant of summary judgment as to the Title Companies and Chicago Title and remanded the case.

A bench trial was held on September 8 and 9, 2008. The court found the Partnership's "economic injury was proximately caused by the Title Companies' breach of the duty of care they owed to the Partnership," and that "Chicago Title is vicariously liable for the negligence of the Title Companies" because the Title Companies were agents for Chicago Title. The court entered judgment on May 11, 2009, awarding the Partnership $191,510.88. The Title Companies and Chicago Title appealed to this Court.

## STANDARD OF REVIEW

In *Goss v. C.A.N. Wildlife Trust, Inc.*, 157 Md.App. 447, 455–56, 852 A.2d 996 (2004), we explained the applicable standard of review:

Because the trial below was a non-jury trial, our standard of review is governed by Maryland Rule 8–131. *Boyd v. State*, 22 Md.App. 539, 323 A.2d 684, cert. denied, 272 Md. 738 (1974). That rule provides that this Court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "A finding of a trial court is not clearly erroneous if there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley*, 109 Md.App. 620, 628, 675 A.2d 596 (1996).

Moreover, "under the clearly erroneous standard, this Court does not sit as a second trial court, reviewing all the facts to determine whether an appellant has proven his case." *Id.* Nor is it our function to weigh conflicting evidence. *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 355 Md. 566, 586–87, 735 A.2d 1081 (1999); *Weisman v. Connors*, 76 Md.App. 488, 547 A.2d 636 (1988), cert. denied, 314 Md. 497, 551 A.2d 868 (1989). Our task is limited to deciding whether the circuit court's factual findings were supported by "substantial evidence" in the record. *GMC v. Schmitz*, 362 Md. 229, 234, 764 A.2d 838 (2001) (quoting *Ryan v. Thurston*, 276 Md. 390, 392, 347 A.2d 834 (1975)). And, to that end, we view all the evidence "in a light most favorable to the prevailing party." *Id.*

Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not. " 'The clearly erroneous standard for appellate review in [Maryland Rule 8–131] section (c) . . . does not apply to a trial court's determinations of legal questions or conclusions of law based on findings of fact.' " *Ins. Co. of N.Am. v. Miller*, 362 Md. 361, 372, 765 A.2d 587

(2001) (quoting *Heat & Power Corp. v. Air Prods. & Chem. Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990)). Indeed, the appropriate inquiry for such determinations is whether the circuit court was "legally correct." *Maryland Envtl. Trust v. Gaynor*, 140 Md.App. 433, 440, 780 A.2d 1193 (2001).

## DISCUSSION

In its Memorandum Opinion issued May 11, 2009, the trial court, implicitly finding that they owed the Partnership a duty of care cognizable in tort, found that the Title Companies breached that duty. The court also found that the Title Companies were agents of the title insurer, and that Chicago Title was vicariously liable for their negligence under the doctrine of respondeat superior. Because of the issues involved, we begin with a general discussion of title insurance and its present role in the buying, selling and financing of real property.

■ Title insurance protects the insured against loss, damage or liability resulting from defects in the title to real property owned by the insured. *See* Md.Code Ann., Insurance Article § 1–101(qq) (2011) (defining title insurance as "insurance of owners of property or other persons that have an interest in the property against loss by encumbrance, defective title, invalidity of title, or adverse claim to title."). Title insurance is now the predominant method by which real estate purchasers and mortgage lenders protect themselves against title risks. D. Barlow Burke, Jr., Law of Title Insurance 1.12, at 1:7 (2d ed. 1993).

Title insurance policies are generally standardized and include the terms and the dollar amount of coverage, exclusions from coverage and any prerequisites to be satisfied before the policy takes effect. The insured typically pays a one-time premium for the coverage. Premiums are based on the insurer's assessment of the risk being assumed, the level of coverage under the policy and the maximum payout under the policy. Title insurance typically affords the insured three "kinds" of coverage. *Stewart Title Guaranty Co. v. West*, 110

Md.App. 114, 128, 676 A.2d 953 (1996) (citing D. Barlow
Burke, Jr., Real Estate Transactions: Examples and Explana-
tions 185 (1993)). First, the insurer agrees to indemnify the
insured in the event of loss or damage resulting from a title
defect. *Id.* Second, the insurer agrees to defend the insured if
a third party attacks the insured's title through litigation. *Id.*
Third, the title insurer agrees to hire experts in title matters,
if necessary. *Id.*

█ It is particularly important in this case to recognize
that title insurance differs from a title opinion based on a title
abstract. A title abstract, covering a particular period of time,
reflects what appears in the public records affecting title to a
parcel of land, and includes any conveyances or encumbrances
of the parcel. *See St. George Antiochian Orthodox Christian
Church v. Aggarwal,* 326 Md. 90, 103, 603 A.2d 484 (1992).
This information is compiled through what is commonly re-
ferred to as a title search of the public records. A title
abstract informs a title opinion, but it is not in itself a
certification that title to the land is without defect. *See Lunn
v. Cummings & Lockwood,* 56 Conn.App. 363, 372–73, 743
A.2d 653 (2000) (citing *Grievance Comm. v. Payne,* 128 Conn.
325, 331, 22 A.2d 623 (1941)). Under the abstract-and-opinion
method, sometimes referred to as "title reporting," the title
abstract is reviewed by an attorney for defects in title, who
then issues a title opinion explaining any defects and the
overall validity (or invalidity) of title as reflected in the
abstract. *Lunn,* 56 Conn.App. at 373, 743 A.2d 653. Before
title insurance, parties ordinarily relied on title opinions to
protect against title defects. James Bruce Davis, *More Than
They Bargained For: Are Title Insurance Companies Liable
in Tort for Undisclosed Title Defects?,* 45 Cath. U.L.Rev. 71,
99 (1995). In the 1920s, title insurance began to replace title
abstracts and opinions as the usual method to protect against
a title defect. *Id.* The shift to title insurance was led by
mortgage lenders, who recognized that title insurance provid-
ed four basic advantages over the title reporting approach: (1)
the insured could recover for losses incurred because of a
covered title defect without having to prove a breach of a

standard of care; (2) the insured could recover for title defects that are not disclosed or apparent in the public records; (3) the title insurance company would provide the insured with a legal defense if the title was attacked; and (4) the title insurance company would be financially able to pay the insured's claim if a loss occurs. *Id.* at 95–97, 99. As in this case, local title companies, individual lawyers or law firms, often take the lead in facilitating the issuance of a title insurance policy. *See Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 255–56, 553 P.2d 254 (1976) (describing how title insurance is typically issued).

### The Title Companies

We consider first the Partnership's negligence claim against the Title Companies. Maryland recognizes an action in tort if the plaintiff can show: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Baltimore Gas & Electric Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995) (quoting *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180 (1994)). The "existence of a legal duty is a question of law to be decided by the court." *Valentine v. On Target, Inc.,* 353 Md. 544, 549, 727 A.2d 947 (1999). Thus, we review de novo the trial court's implicit determination the Title Companies owed a legal duty to the Partnership. *See Nesbit v. Govt. Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879 (2004).

The trial court found the evidence "sufficient to establish that Cambridge and Columbia Title were engaged by the Partnership to perform all the duties expected of a title company in connection with the purchase of land in a commercial real estate transaction." [3] Appellants do not directly

---

3. The trial court did not elaborate on what duties were expected of a title company in connection with the purchase of land in a commercial real estate transaction nor on the source of those duties. Presumably, the trial court found that there was a breach of a duty to find the prior

challenge this finding. They argue instead that "the relationship between the Partnership and the Title Agencies was contractual in nature ... the Partnership can not, therefore, recover damages in tort." The parties agree that a contractual obligation alone does not create a legal duty enforceable in tort.

In Maryland, "[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 654–55, 741 A.2d 1099 (1999); *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879 (1961). If an independent basis for a tort claim was not required, all contract duties would become legal duties, and "[f]ollowed to its legal conclusion, [that] would make every breach of contract a tort." *Russell & Co. v. Polk County Abstract Co.*, 87 Iowa 233, 54 N.W. 212, 213 (1893). As the United States Supreme Court has cautioned, should a tort duty of care arise from a contractual obligation alone, "contract law would drown in a sea of tort." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

---

conveyance of the Parcel to Dr. Khan. The dissent asserts that when purchasers of real property engage a title company to conduct settlement, the purchaser "expects, at a minimum, that the title company will (1) confirm that the seller holds good and marketable title and (2) prepare a deed that transfers good and marketable title to the purchaser," and concludes that the trial judge was not persuaded that the Partnership "contracted for limited services from either Cambridge Title or Columbia Title." As we explain, there is no direct evidence of the terms of the engagement in regard to title expectations except to the extent that the Title Companies issued title binders and title insurance polices to the Partnership. Alternatively, the dissent suggests that the Partnership should be entitled to recover for breach of contract. We do not agree because there is no evidence to support an agreement to provide a title opinion separate from the title binder and the title insurance policy. *See infra* note 6, pp. 82–83, 36 A.3d at 997–98. As to the deed, Real Property Article, Section 3–104(f) does not permit a deed to be recorded without the certification of an attorney that the deed "has been prepared by an attorney or under an attorney's supervision," or by "one of the parties named in the instrument."

■ In some situations, however, a duty imposed by law and enforceable in tort overlaps a contractual obligation. "Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of circumstances surrounding or attending the transaction, the breach of such duty is a tort." *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 534, 515 A.2d 756 (1986); *Slacum v. Eastern Shore Trust Co.*, 163 Md. 350, 352–53, 163 A. 119 (1932). Here, the parties disagree on whether the circumstances in this case give rise to a duty of care cognizable in tort independent of the contractual obligations.

Appellants contend that Maryland law dispositively establishes that a title examiner's duties are contractual in nature. In support of that contention, they cite *Corcoran v. Abstract & Title Company of Maryland, Inc.*, 217 Md. 633, 143 A.2d 808 (1958), as establishing breach of contract as the sole theory of recovery should a title company negligently conduct a title search. The Partnership contends that a contractual obligation does not preclude the court from also imposing a duty in tort for a breach of that obligation. Citing *Jacques*, 307 Md. at 527, 515 A.2d 756, it argues that current Maryland law provides for tort recovery as a matter of public policy. We will review first Maryland cases addressing whether a title company employed to examine title can be liable in tort for a negligent search, and then consider whether, under *Jacques*, there arose an independent tort duty, owed to the Partnership, to use reasonable care in the title search.

■ In *Corcoran*, a title company engaged to examine title, failed to report, as in this case, a properly indexed instrument impacting the parcel. 217 Md. at 635–37, 143 A.2d 808. The Court of Appeals held that

"[o]ne who undertakes to examine a title for compensation is bound to exercise a reasonable degree of skill and diligence in the conduct of the transaction. [Recovery against a title examiner], 'although ordinarily enforced by an action of case for negligence in the discharge of his professional duties, in

reality rests upon his employment by the client and is contractual in nature.' "

*Id.* at 637, 143 A.2d 808 (quoting *Watson v. Calvert Bldg. Ass'n,* 91 Md. 25, 33, 45 A. 879 (1900)). Most importantly, because "the liability is contractual, it may be limited in its scope by apt and clear language." *Id.*

The *Corcoran* Court, citing *Russell & Co.,* stated: "It is generally recognized that damages are recoverable on the theory of breach of contract, and the legal situation is not changed by the fact that the contractual act bargained for is negligently performed." *Id.* (citing *Russell & Co. v. Polk County Abstract Co.,* 87 Iowa 233, 54 N.W. 212 (1893)).

In *Russell,* a title abstractor was sued for negligence for failing to disclose a judgment lien. The record was clear that there was "an absolute undertaking 'to furnish a full, complete and correct abstract ... showing the liens of mortgages, judgments and otherwise.'" 54 N.W. at 213. The Supreme Court of Iowa held:

[T]he defendant, independent of contract, owed no duty to the plaintiff. The neglected duty was one alone enjoined by contract. The failure to perform by the defendant was a failure to discharge its agreement, which is solely a breach of contract. No refinement of reasoning can, or should, avoid the [sic] conclusion.

*Id.* In other words, the basis for liability was the breach of the agreed upon undertaking, rather than the negligent search.

The *Corcoran* Court also cited *Bridgeport Airport, Inc. v. Title Guaranty & Trust Co.,* 111 Conn. 537, 150 A. 509, 510 (1930), where the court held that an action brought against a title company for including an invalid judgment lien in its abstract, "properly ... l[ay] in contract" because absent a contract, a title company owed no duty regarding the status of title. "To hold the [title abstractor] liable is ... only to require it to fulfill its agreement with the [contracting party]." *Id.*

In *Lewis v. Long & Foster Real Estate, Inc.,* 85 Md.App. 754, 584 A.2d 1325 (1991), this Court addressed a similar

question of whether a "title abstractor/settlement agent" engaged to conduct "all services necessary to effect the settlement" had a "duty to report to the buyer all matters of record affecting the status of title," including "restrictions on the use of the property." *Id.* at 756–57, 584 A.2d 1325. There, we affirmed the trial court's dismissal of the buyer's claim that the title company was liable for failing to report such a matter because "no 'contract' appear[ed] in the record." *Id.* at 764, 584 A.2d 1325. In that opinion, we cited *Corcoran* and reiterated that an abstractor's "liability rests on the instructions given ... to the Title Company." *Id.* Thus, *Corcoran* stands for the proposition that a title examiner is contractually bound to exercise "a reasonable degree of skill and diligence," but the contract establishes the bounds of the examiner's liability, whether enforced in tort or contract.[4]

Directing our focus to *Jacques,* the Partnership asserts that the Court of Appeals has established the current state of Maryland law regarding the imposition of a tort duty. It posits that *Corcoran* did not restrict an action against a title abstractor to contractual claims, but, even if it did, the *Jacques* decision supplants *Corcoran,* and extends a tort duty of care to searches and examination of title done in connection with the issuance of title insurance.

In *Jacques v. First Nat'l Bank of Maryland,* 307 Md. 527, 515 A.2d 756 (1986), the plaintiffs submitted to a bank an application for a loan to satisfy the terms of an executed real estate contract that required that they settle on receiving a loan at a certain interest rate. The bank first informed the Jacqueses that they qualified for a $74,000 loan, but later informed them that a mistake had been made and that, under the bank's guidelines, they only qualified for a $41,400 loan. As a result, the Jacqueses had to forfeit their $10,000 deposit

---

**4.** The cases cited in *Corcoran* adopt the position that contract is the sole theory of recovery. But, in *Lewis,* we acknowledged in a footnote that Maryland has yet to dispositively rule that contract is the exclusive remedy with respect to a title examination, but that some other jurisdictions have found an independent tort duty exists. 85 Md.App. at 764, n. 5, 584 A.2d 1325.

because a loan for $41,400 would not permit them to complete the purchase. The Jacqueses sued the bank for malicious interference with contract, gross negligence and negligence. A jury returned a verdict in favor of the Jacqueses on the negligence claim and awarded them $10,000 in compensatory damages. We reversed, holding that the bank had no independent duty to use due care in evaluating the loan application.

The Court of Appeals granted certiorari to consider "whether a bank that has agreed to process a loan application for a loan owes to its customer a duty of reasonable care in the processing and determination of the application," and determined that a duty of care was owed. *Jacques,* 307 Md. at 528, 515 A.2d 756. In its analysis, the Court found two New York cases instructive: *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), and *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). In each, it was determined that a party to a "contract owed a tort duty of care to the parties with whom they had contractual privity or its legal equivalent." *Jacques,* 307 Md. at 536, 515 A.2d 756. In *Glanzer,* a public weigher of beans, who held herself out as skilled and careful, was held liable in tort for negligence. 233 N.Y. at 239, 135 N.E. 275. Similarly, in *Ultramares,* a public accountant, who negligently prepared and certified a balance sheet, was found liable in tort to the client who had contractually engaged the accountant to prepare financial statements. 255 N.Y. at 178, 174 N.E. 441. While the decisions came down differently on whether liability would extend to an injured third party, the New York Court of Appeals held a cause of action in tort was available to a party to the contract.

In *Jacques,* the Court began by reiterating that a negligent breach of contract " 'itself, is not enough to sustain an action sounding in tort.' " *Jacques,* 307 Md. at 534, 515 A.2d 756 (quoting *Heckrotte v. Riddle,* 224 Md. 591, 595, 168 A.2d 879 (1961)). But, should a legal duty attend the contractual relationship, " 'the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the

contract.' " *Id.* (quoting *Slacum v. Eastern Shore Trust Co.,* 163 Md. 350, 352–53, 163 A. 119 (1932)). Nevertheless, "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This requirement is satisfied by contractual privity or its equivalent." *Id.* at 534–35, 515 A.2d 756. The analysis then turned to whether the requisite privity or its equivalent existed. The Court concluded that because the bank undertook to process the loan application, a contract existed and the intimate nexus inquiry was satisfied. *Id.* at 540, 515 A.2d 756.

With the intimate nexus established, the Court considered whether the bank was bound to exercise reasonable care in fulfilling its obligations to the Jacqueses. Noting an implied promise to use reasonable care in agreeing to process the loan application and the Jacqueses' reliance on the bank's judg-ment, the Court looked to "the public nature" of the banking business, reflected in the State's regulation of the industry and the industry's importance to the public welfare, to determine "whether a concomitant tort duty should be recognized under these circumstances." *Id.* at 540, 515 A.2d 756.

Three separate considerations informed that determination. First, "the rather extraordinary financing provisions contained in the real estate sales contract, and thereby integrated into the loan application, [which] left the Jacqueses particularly vulnerable and dependent upon the Bank's exercise of due care." *Id.* More specifically, the bank knew that the Jacqueses were contractually bound to settle with whatever loan they could obtain at an agreed upon interest rate or forfeit their deposit of $10,000. In addition, the Jacqueses were subject to a dramatic increase in the prime rate of interest that had occurred during the processing of the loan. *Id.* at 541, 515 A.2d 756.

Second, the Court reflected on the professional skill re-quired. According to the Court, "[t]he law generally recog-nizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects,

and public accountants. Additionally, [Maryland courts] have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill." *Id.* (citing *St. Paul at Chase Corp. v. Mfrs. Life Ins.*, 262 Md. 192, 219–220, 278 A.2d 12 (1971), *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971)).

And third, the Court considered the General Assembly's regulation of the banking industry, which imposed similar obligations. It concluded that recognizing a tort duty was consistent with Maryland policy "and reasonable in light of the nature of the banking industry and its relation to the public welfare." *Id.* at 543, 515 A.2d 756. The Court commented that courts in other jurisdictions imposed obligations on banks to conduct their business diligently and honestly. *Id.*

██ Based on our review of *Jacques* and its progeny,[5] in addition to applicable case law, we are not persuaded that *Jacques* and the circumstances in this case require extending an independent tort duty to the Title Companies. As one federal district court has stated in regard to *Jacques*, "the Court of Appeals did not pretend to foretell all of the circumstances under which a tort duty will be imposed upon parties in a direct relationship with each other." *Flow Industries, Inc. v. Fields Construction Co.*, 683 F.Supp. 527, 530 (D.Md. 1988).

As noted earlier, neither the Title Companies nor the Partnership contest the existence of a contractual relationship; they dispute the duties and limitations of liability imposed on the Title Companies in that contractual relationship.[6] Thus,

---

5. Appellee cites subsequent Maryland decisions including *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (2000), where the Court found the intimate nexus requirement was satisfied where a third party lender relied on financial statements prepared by an accountant for the accountant's client. *See also Chicago Title Ins. Co. v. Allfirst Bank*, 394 Md. 270, 905 A.2d 366 (2006) (extending duty owed by bank to a non-customer).

6. The record contains the title commitments and binders issued by the Title Companies, the Safeco title insurance policy and the agency

for the purposes of this opinion, we shall assume that there was an intimate nexus between the Partnership and the Title Companies. The exact nature of what was agreed to is disputed, but what we do know is that both Title Companies issued title insurance to the Partnership.

In considering whether the circumstances justify imposing a duty independent of the contract, it is appropriate to consider applicable legislation and the public policy reflected in that legislation. We have not been directed to, nor have we found, a statutory obligation in Maryland that imposes on either a title company or a title insurer a duty to exercise due care in performing a title search, such as found in some other jurisdictions. *See Ruiz v. Garcia,* 115 N.M. 269, 272, 850 P.2d 972 (1993) (holding Section 59A–30–11(A) of the New Mexico Code imposed a tort obligation to conduct a reasonable title search); *Bank of Cal., N.A. v. First Amer. Title Ins. Co.,* 826 P.2d 1126, 1130 (Alaska 1992) (Alaskan statute requires a title insurer to conduct a reasonable search and examination of title before issuing policy). The *Ruiz* Court relied on New Mexico Code in permitting a tort action against a title company in the absence of a contractual obligation to do so. *Ruiz,* 115 N.M. at 272, 850 P.2d 972. Section 59A–30–11(A) of the New Mexico Code provided that "[n]o title insurance policy may be written unless the title insurer or its title insurance agent has

agreement between Cambridge and Chicago Title. There is no express agreement to conduct a title examination and no title abstract or opinion in the record. Although the Title Companies and Chicago Title destroyed many of their files, this is not a spoliation case. The files were destroyed before appellants knew there was a title problem. Attached to the Chicago Title preliminary commitment as Schedule C and the Safeco policy as Schedule A–1 is a survey conducted of the Parcel, the former being conducted by Dewberry. Schedule B–1 in the Safeco policy also contains conditions regarding title that must be resolved to Safeco's satisfaction. The parties dispute whether a full title examination or perhaps a run-to-date in the case of Columbia was to be conducted and for whose benefit the title search was performed. They offered deposition testimony regarding standard practices concerning the extent of title examination that would be conducted and the implications of the fact that the settlement statement included no fees for a title examination.

caused to be conducted a reasonable search and examination of the title." N.M. Stat. Ann. § 59A–30–11(A) (Supp.1992).

Nor has the General Assembly indicated an intent to enact such a statute. In 2008, the Maryland General Assembly passed Senate Bill 61 and House Bill 600 (Chapters 356 and 357, Acts of 2008) to create a Commission to Study the Title Insurance Industry in Maryland (the "Commission").[7] The Commission issued its report and recommendations in February 2010. There was no recommendation for legislation requiring a reasonable title search and examination of title before issuing a title binder of policy. Thus, we see no legislatively supported public policy for imposing a tort duty on a title company related to a title search done for the purpose of insuring title.

 To be sure, Maryland public policy imposes a duty, independent of any contractual relationship, of reasonable care in the exercise of professional skill and judgment, as in the case of attorneys, physicians, architects and accountants. *Jacques,* 307 Md. at 541, 515 A.2d 756 (citing *St. Paul,* 262 Md. at 219–220, 278 A.2d 12. *See also Flaherty v. Weinberg,* 303 Md. 116, 138, 492 A.2d 618 (1985)) (stating that an attorney cannot freely contract because there are limitations on attorney conduct that are judicially imposed and enforced). The dissent characterizes title companies as "professionals providing paralegal information services," arguing that tort liability should be extended for a negligent title search. On the other hand, conducting a title search as part of the risk assessment in issuing a title insurance policy is not the same as an attorney rendering a title opinion on which a client is going to rely. A "paralegal" is defined as "[a] person who assists a lawyer in duties related to the practice of law but who is not a licensed attorney," BLACK'S LAW DICTIONARY 1136 (7th ed.

---

7. The Commission was formed in response to an April 2007 United States Government Accountability Office (GAO) Report to the United States House of Representatives Committee on Financial Services entitled *"Actions Needed to Improve Oversight of the Title Industry and Better Protect Consumers "* and, due in large part, to the significant rise in property foreclosure rates.

1999), but, as one court has observed, "[t]itle abstracting does not require a Juris Doctor; does not involve the practice of law; and does not require the exercise of professional judgment or the rendering of legal opinions on marketability and insurability [of title]." *Lawyers Title Ins. Corp. v. Groff*, 148 N.H. 333, 339, 808 A.2d 44 (2002).

In fact, as to "opinions on marketability and insurability" of title, in Md.Code Ann., Business Occupations and Professions Article § 10–102(2) (2010 & Supp.2011), Maryland has excepted title insurers, and presumably their agents, from the unauthorized practice of law by permitting "a title insurance company to examine and to insure titles to real property." As we read that provision, the authorized title examinations by a title insurance company are directly tied to insuring title. A title opinion independent of a title insurance policy remains part of the practice of law. By this exception, the General Assembly is acknowledging the shift from title reporting to title insurance.

Second, while an insurance producer must "pass a written examination that relates to that kind or subdivision of insurance" to become licensed and "receive continuing education as a condition of renewing [that] license," Md.Code Ann., Insurance Article § 10–108(b), 10–116(a) (2011), the educational requirements are distinct from those of an attorney or accountant.[8] There is no indication that the test and continuing education focuses on ensuring proficiency in the search and examination of title. Furthermore, the Maryland Insurance Administration ("MIA") requires an agent or a "title insurance producer," defined as a person or entity that "solicits, pro-

---

**8.** In *Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 624 A.2d 496 (1993), the Court discussed whether an attorney engaged to handle matters of title, which included a title examination, is liable in tort or contract. The Court discussed its holding in *Corcoran* that a negligence action against a title insurer rests upon contract and its holding in *Cochrane v. Little*, 71 Md. 323, 18 A. 698 (1889), that expressed an attorney's independent obligation to exercise ordinary care and diligence in her professional obligation. In the end, the Court did not decide the issue because the damages claimed were not enforceable under either a tort or contract theory.

cures or negotiates title insurance contracts," [9] to be licensed. *Id.* at § 10–101(i)(1), 10–103(c). The MIA license ensures that a blanket fidelity bond, or its equivalent, has been filed to protect against business losses. *Id.* at § 10–121(g). While the requirement of a license ensures "that the applicant is reasonably familiar" with title insurance, *id.* at § 10–104(f)(1)(i), it is primarily directed towards protecting the insured against any loss caused by a title insurance producer that "converts or misappropriates money received or held in escrow or trust" while "providing any escrow, closing or settlement services," not matters of title. *Id.* at § 10–121(f)(1).

Here, whatever title searches were done in this case were ultimately done in connection with the issuance of a title insurance policy. In *Jacques,* the bank was aware the real estate sales contract obligated the Jacqueses, who were unsophisticated homebuyers, to accept the bank's financing terms or either forfeit $10,000 or subject themselves to a dramatic increase in interest rates to obtain a loan in an amount that would permit them to close on the contract. Moreover, the Jacqueses, unlike the Partnership, had no other means of recovery except against the bank. Here, a real estate developer, presumably more sophisticated in real estate transactions than the average home buyer, purchased a title insurance policy to protect against losses resulting from non-excluded title defects. In sum, we are not persuaded that *Jacques* require that we extend tort liability to the Title Companies on the facts of this case.[10]

---

9. According to the Report of the Commission to Study the Title Insurance Industry in Maryland, issued in February 2010, available at http://www.mdinsurance.state.md.us/sa/documents/TitleCommissionReport 03–10.pdf (last accessed November 17, 2011) on page 15, "[a] title insurance producer underwrites the risk, collects the title insurance policy premiums, issues the title insurance policies, conducts the settlement or closing, and holds funds in escrow for mortgage payoffs, taxes, closing costs, commissions for real estate brokerage services, and other costs related to settlement or closing."

10. We recognize that the purchase of real property is one of the most important financial decisions in people's lives and that consumers are

## The Title Insurer

If the Title Companies do not owe a tort duty to the Partnership, Chicago Title would not be vicariously liable for the Title Companies' negligence. But, even if the Partnership's tort claims against the Title Companies were cognizable, Chicago Title would not, in our view, be liable for the negligence of the Title Companies. Whether a title insurance company can be vicariously liable for the actions of its agents in regard to title searches appears to be a question of first impression in Maryland.

Jurisdictions disagree on whether an insurer is liable in tort for an undisclosed defect in a title report or abstract. Compare *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 562 A.2d 208 (1989) (holding a title insurer's liability is limited to the policy, thus, there is no tort obligation to engage in a reasonable title search) and *J.H. Trisdale, Inc. v. Shasta County Title Co.*, 146 Cal.App.2d 831, 836–37, 304 P.2d 832 (1956) (stating "the doctrine of negligence has no application to a contract of title insurance") with *Bank of Cal., N.A. v. First Amer. Title Ins. Co.*, 826 P.2d 1126 (Alaska 1992) (imposing a tort duty on a title insurer as matter of case law, but noting that an Alaskan statute requires a title insurer to conduct a reasonable search and examination of title).

Opinions typically turn on whether the court views the title search as being performed for the benefit of the title insurer in underwriting the policy or whether it was performed to supply title information to the insured.[11] James Bruce Davis,

---

not necessarily aware of differences between title insurance and abstract-and-opinion reporting in protecting against title defects. But, we are persuaded that the extension of tort liability to title companies in the absence of a separate agreement beyond the issuance of a binder and title insurance policy is more appropriately addressed by the General Assembly.

11. The dissent, citing RESTATEMENT (SECOND) OF TORTS § 552 (1977), also argues that tort liability should be extended for "negligently provid[ing] false information for the guidance of others." This arguments rests on the proposition that the purpose of the title search is to supply information to the purchaser.

*More Than They Bargained For: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects?*, 45 Cath. U.L.Rev. 71, 75 (1995) ("[A]uthorities disagree on whether a title insurance company, in issuing title commitments and policies, has undertaken a distinct duty to provide its insured with title information."). "Courts that view title insurance companies as suppliers of information tend to hold that the companies are subject to the rules of tort liability." *Id.* "Courts that do not view title insurance companies as suppliers of information usually find tort principles inapplicable on grounds that the title insurance policy provides both the source and measure of the company's liability." *Id.*

While there is no Maryland decision directly addressing the duty of a title insurer or its agents to conduct a full title examination, we adopted the view in *Stewart Title Guaranty Co. v. West* that a title insurance policy is a contract for indemnity and not a guarantee of marketable title. 110 Md.App. 114, 131, 676 A.2d 953 (1996). Jurisdictions that consider a title insurance policy to be a contract of indemnity hold that the policy does not guarantee marketable title. *Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1062 (1st Cir.1990). In *West,* the insured homeowners alleged breach of contract and negligent supervision of its agents by Stewart Title, the title insurer. 110 Md.App. at 123, 676 A.2d 953. The negligent supervision claim appeared to rest on the theory that Stewart Title's agents had failed to determine that the title was unmarketable.[12] *Id.*

The Wests had purchased a piece of property and employed Land Title Research of Maryland, Inc. ("Land Title") to serve as their settlement agents. Closing was conducted at Land

---

12. The circuit court granted a motion for summary judgment in favor of the plaintiffs on the breach of contract claim, finding title was clearly unmarketable. Therefore, the negligence claim was not addressed in the circuit court or in this Court's opinion. Presumably, the Wests' claim that Stewart Title breached a duty of care in supervising its agents implicitly rested on the premise that a reasonable title search would have revealed the defects in the Wests' title and not permitted unmarketable title to be delivered.

Title's offices. There, the Wests purchased both an "owner's policy" and a "lender's policy," issued by Stewart Title. *Id.* at 120, 676 A.2d 953. The Stewart Title policies were standard form title insurance policies. *Id.* at 131, 676 A.2d 953. The policy at issue stated, in part:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, STEWART TITLE GUAR-ANTY COMPANY, a corporation of Galveston, Texas, here-in called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attor-neys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. Any defect in or lien on encumbrance on such title;

3. Lack of a right of access to and from the land; or

4. Unmarketability of such title.

*Id.* at 120–21, 676 A.2d 953. Later, multiple title defects were discovered. Portions of the property had not been properly conveyed; the conveyed property was "landlocked" and the instrument creating the only right-of-way access to the prop-erty was improperly conveyed to a different property owner. *Id.* at 121–22, 676 A.2d 953. Finding title unmarketable, the circuit court granted a motion for summary judgment against the title insurer. *Id.* at 126, 676 A.2d 953. On appeal, the Wests argued that the grant of the motion for summary judgment be affirmed because title was unmarketable and "they were entitled to collect under their Policy" for defects in the title, namely the lack of a right-of-way access to the property and the delivery of an unmarketable title. *Id.* at 125, 676 A.2d 953.

Acknowledging that the title was clearly unmarketable, this Court remarked that, "there are few title problems more

palpable than complete lack of access to a public road," *id.* at 138, 676 A.2d 953, but "[t]he issue of marketability, however, is not dispositive of liability in this case. Rather, the issue is whether Stewart Title *breached* the Policy." *Id.* at 140, 676 A.2d 953 (emphasis in original). Adopting the predominant view among jurisdictions considering the issue, we concluded that "a title insurer does not guarantee the state of the title. Instead a title insurance policy is a contract of indemnity," *id.* at 131, 676 A.2d 953, in which, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title problems, if coverage for the loss or damage is not excluded from the policy. *See First Federal Savings and Loan Ass'n of Fargo, N.D. v. Transamerica Title Ins. Co.,* 19 F.3d 528, 530 (10th Cir.1994); *Focus Investment Associates, Inc. v. American Title Ins. Co.,* 992 F.2d 1231, 1237 (1st Cir.1993); *Chicago Title Ins. Co. v. McDaniel,* 875 S.W.2d 310, 311 (Tex.1994).

 Vacating the motion for summary judgment, this Court stated:

> [T]he insurer is not immediately in breach simply because title is defective on the day the policy is issued—is more in line with both title insurance law and the standard form title insurance policy that we have before us. *As we have observed, a title insurer does not guarantee the state of the title. Instead, a title insurance policy is a contract of indemnity. The view that a title insurer is in breach simply because there are defects in the title at the time the policy is issued would turn the title insurer into the guarantor of the grantee's title.*

*West,* 110 Md.App. at 131, 676 A.2d 953 (emphasis added). "[T]he mere existence of title defects does not, in and of itself, mean that a title insurer is in breach of the insurance policy," *id.* at 140, 676 A.2d 953, because, "[o]nce advised of a title problem, the insurer still has the option of paying the insured's loss, clearing the defects within a reasonable time, or showing that the defects do not exist." *Id.* at 136, 676 A.2d 953. Therefore, we ordered that, on remand, consideration be

given to "whether Stewart Title paid the Wests' loss or cleared the defects within a reasonable time after receipt of notification of the defects." *Id.* at 140, 676 A.2d 953.

Moreover, courts that view a title insurance policy as a contract of indemnity ordinarily see the title search as an underwriting function. As one commentator has explained:

> [S]ystems of insurance protection depend on the insurance companies' ability to quantify the risk they assume, charge premiums commensurate with the risk, and establish reserves sufficient to cover actuarially predictable losses under their policies. Under this view, a title insurance company's search of the public records is a function it performs for its own benefit when underwriting a policy, not for the purpose of supplying title information to the insured.

James Bruce Davis, *More Than They Bargained For: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects?*, 45 Cath. U.L.Rev. 71, 83 (1995).

We are persuaded that holding a title insurer liable in tort for a negligent title examination by its agents conflicts with this Court's holding in *West.* To create a tort remedy for a negligent title search performed for the issuance of a title insurance policy would make the title insurer a guarantor of title and deprive the insurer of its option to cure the title or to pay for covered losses as contracted for in the title insurance policy. Jurisdictions that consider a title insurance policy as an indemnity contract do not provide an independent tort remedy because, to do so, would undermine an insurer's ability to manage its risks by the terms of its policies. That title examinations performed for the issuance of title insurance are essentially an underwriting function is consistent with our decision in *West* and the statutory authority granted to title insurers to examine and insure title. Even if an agent of a title company is authorized to examine title, independent of the title insurance policy, there would need to be some special agreement outside of the title insurance commitment and the title insurance policy.

*The Scope of Title Agency Agreements*

Based upon its interpretation of the agency agreement and expert testimony from John Llewellyn,[13] the trial court found that the Title Companies were agents of Chicago Title and that "Chicago Title ha[d] the right to control all aspects of its agent's activities and [wa]s not limited to the mere issuance of title insurance policies."[14] Therefore, in the court's view, Chicago Title, as the principal, was vicariously liable for the Title Companies' negligent title searches. Appellants argue that the Title Companies were agents only for the issuance of a title insurance policy, and that Chicago Title was not vicariously liable for a negligent title search. Instead, its liability is limited to that provided for in the policy issued in the scope of the agency relationship.

■■■ We will address (1) whether the Title Companies were agents of the respective insurer and, if so, (2) what was the scope of that agency relationship and (3) did the insurer disclaim vicarious liability for a tort action regarding title status under the title insurance policy. Because, the relationship between an insurance company and its agents is governed by the law of principal and agent, *see, e.g., Travelers' Ins. Co. v. Melman*, 147 Md. 459, 128 A. 125 (1925), our analysis begins with a general discussion of agency and a principal's liability for acts of an agent.

■■■ An agent is authorized to act on behalf of and to bind the principal. *See Walton v. Mariner Health of Md., Inc.*, 391 Md. 643, 655, 894 A.2d 584 (2006) (citing *Strawn v.*

---

13. Llewellyn testified that the agency agreement is a

"fairly standard agreement ... where the title company, in this case Cambridge, is agreeing to be an agent for Chicago Title, and Chicago Title is agreeing to accept them as an agent. And Cambridge Title is agreeing to conduct itself in a certain fashion and to obey the rules that—that is set forth by the underwriting company as far as issuing—handling closings and issuing title insurance."

14. As discussed, Cambridge was an agent of Chicago Title; Columbia was the agent of Safeco. With the merger of Safeco and Chicago Title, Chicago Title stepped into the shoes of Safeco. We will treat Chicago Title as the insurer in both instances.

*Jones,* 264 Md. 95, 98, 285 A.2d 659 (1972)). For a principal to be liable for the tortious acts of its agent, the relationship must be one of master and servant, and the servant must be acting in the scope of the agency agreement. *Sanders v. Rowan,* 61 Md.App. 40, 484 A.2d 1023 (1984). Servants are distinguishable from agents because servants "render service to, rather than for, the master." *Id.* at 50, 484 A.2d 1023 (quoting *Henkelmann v. Metropolitan Life Ins. Co.,* 180 Md. 591, 600, 26 A.2d 418 (1942)).

▆▆▆▆▆ Section 220 of the Restatement (Second) of Agency defines a servant as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services, is subject to the other's control or right to control." RESTATEMENT (SECOND) OF AGENCY § 220(1) (1958). A comment to the Restatement (Second) of Agency Section 220 lists eleven factors indicating a master-servant relationship:

> The relation of master and servant is indicated by the following factors: an agreement for close supervision or de facto close supervision of the servant's work; work which does not require the services of one highly educated or skilled; the supplying of tools by the employer; payment by the hour or month; employment over a considerable period of time with regular hours; full time employment by one employer; employment in a specific area or over a fixed route; the fact that the work is part of the regular business of the employer; the fact that the community regards those doing such work as servants; the belief by the parties that there is a master and servant relation; an agreement that the work cannot be delegated.

RESTATEMENT (SECOND) OF AGENCY § 220 cmt. h.[15] No single factor is dispositive, but the decisive factor in determining the existence of a master-servant relationship is the level of

---

**15.** Although this specific provision of the comment has not been previously cited by Maryland courts, other provisions of § 220 have been cited with approval. *See, e.g., Sanders,* 61 Md.App. at 50, 484 A.2d 1023.

control that the principal exerts over the agent. *Chevron U.S.A., Inc. v. Lesch,* 319 Md. 25, 33, 570 A.2d 840 (1990) (citing *Keitz v. National Paving Co.,* 214 Md. 479, 491, 134 A.2d 296 (1957)). Whether the principal exerts the requisite amount of control to create such a relationship is a fact-intensive inquiry. *See Miller,* 362 Md. at 372, 765 A.2d 587 ("The determination of the existence of a principal-agent relationship is, generally, a question of fact."); *Globe Indem. Co. v. Victill Corp.,* 208 Md. 573, 585, 119 A.2d 423 (1956).

Only the agency agreement between Cambridge and Chicago Title is in the record. The circuit court heard expert testimony that agency agreements are fairly standardized through the title insurance industry. Because the parties do not argue otherwise, we will treat the agency agreement between Cambridge and Chicago Title as generally the same as the agreement between Columbia and Safeco in our consideration of the Restatement (Second) of Agency § 220 comment factors.

Chicago Title's agreement with Cambridge clearly reflects an agency relationship with the use of terms "agent" and "principal" and by explicitly providing that the agreement is non-assignable without consent. Moreover, the agency agreement supports a finding that Chicago Title had the right to exercise certain control over Cambridge. For example, the agency agreement allows Chicago Title to access records and supervise Cambridge in matters "relating to the business carried on hereunder and to the closing of transactions committed in the issuance of [Chicago Title's] policies of insurance."

Appellants do not challenge the court's finding of an agency relationship. The agreement expressly authorizes the agent to "validate, countersign, issue and deliver commitments, policies and endorsements" in providing title insurance. What they contend is that a title company can perform multiple tasks and "neither Cambridge nor Columbia was an agent of [the insurer] for all purposes." In appellants' view,

[G]iven their multiple responsibilities, local title companies often wear "two hats." On the one hand, they issue and sign policies underwritten by the title insurance underwriter, and, on the other hand, they search title and close the transaction. *See Sommers v. Smith and Berman, P.A.,* 637 So.2d 60, 62 (Fla. 4th DCA 1994) (holding that [sic] underwriter was not liable in tort for the negligence of the local issuing agent in closing the real property transaction). The fact that a local title company may issue title policies for an underwriter does not make the local title company an underwriter's agent for other purposes. *See Cameron County Savings Ass'n v. Stewart Title Guar. Co.,* 819 S.W.2d 600 (Tex.Ct.App.1991) (holding that the underwriter's grant of authority to collect title premiums and issue title insurance did not make the underwriter vicariously liable for the local tile [sic] company's negligence in closing the transaction).

The cases cited by appellants focus on the scope of the agent's authority. In *Sommers,* a title company was engaged to issue a title insurance policy and to close the transaction. Because the title insurer only conferred responsibility to the agent title company for the purpose of issuing the insurance policy, the agent's actual and apparent authority was limited to that function. *Sommers,* 637 So.2d at 61–62. In *Cameron County,* the court found the title company was the insurer's agent only for the purpose of receiving insurance premiums and issuing title insurance, and that any losses caused by the agent by other actions was outside of the scope of the agency. *Cameron County,* 819 S.W.2d at 602–03.

■■■ In Maryland, an agent is authorized to bind the principal within the limits of the agent's prescribed authority. *See Walton,* 391 Md. at 655, 894 A.2d 584. This authority includes not only those acts committed in the scope of the agent's actual authority, but also acts occurring within the scope of its apparent authority. *Melman,* 147 Md. at 459, 128 A. 125; *Baltimore Police Dep't v. Cherkes,* 140 Md.App. 282, 332, 780 A.2d 410 (2001) (stating that an employee's tortious

conduct is considered within the scope of employment if authorized and in furtherance of the employer's business). Similarly, Section 219 of Restatement (Second) of Agency provides that a master is liable for the tortious conduct of its servant if the conduct is committed within the scope of employment or based on the servant's apparent authority.[16] RESTATEMENT (SECOND) OF AGENCY § 219(1)-(2) (1958).

One who deals with an agent knowing of the agent's limitations cannot hold the principal liable for acts committed beyond those limits. *Brooks v. Euclid Sys. Corp.*, 151 Md.App. 487, 516–17, 827 A.2d 887 (2003); *Hill v. State*, 86 Md.App. 30, 585 A.2d 252 (1991). The Court of Appeals has repeatedly held one cannot recover against an insurance provider for an agent's acts where the policy placed the insured on notice that the acts are beyond the scope of the agent's authority. *See Reserve Ins. Co. v. Duckett*, 240 Md. 591, 214 A.2d 754 (1965); *Simpson v. Prudential Ins. Co. of America*, 227 Md. 393, 398–99, 177 A.2d 417 (1962). Here, both the agency agreement and insurance policy limit the Title Companies' actual and apparent authority to act on behalf of the title insurer. *Cf. Eureka–Maryland Assur. Corp. v. Samuel, et al.*, 191 Md. 603, 62 A.2d 622 (1948) (finding language in a provision of an insurance policy was sufficient to put a third party on notice of limitations on the agent's authority, but that the provision's enforceability turned upon whether the State permits such restrictions). *See also Atty. Griev. Comm'n v. Smith*, 376 Md. 202, 227, 829 A.2d 567 (2003).

Principles of contract law govern the construction of the agency agreement and the title insurance policy, *see Walton*, 391 Md. at 660, 894 A.2d 584, and the same rules of construction that apply to other types of insurance policies apply in this case. *Falmouth*, 920 F.2d at 1061. The rights and obligations of the parties are determined by the terms of

---

**16.** RESTATEMENT (SECOND) OF AGENCY § 219 (1958) also provides a master is liable if a servant's tortious conduct is intended by a master, caused by a master's negligence or violated a non-delegable duty. Appellee does not argue any of these positions in its brief.

the contract unless a statute, regulation or public policy is violated thereby. *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 488 A.2d 486 (1985); *Bond v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 289 Md. 379, 424 A.2d 765 (1981); *Nat'l Grange Mut. Ins. Co. v. Pinkney,* 284 Md. 694, 399 A.2d 877 (1979). In interpreting the policy's terms, words are accorded their ordinary and accepted meaning, absent evidence that the parties intended a special or technical meaning. *Nationwide Mutual Ins. Co. v. Scherr, et al.,* 101 Md.App. 690, 647 A.2d 1297 (1994). In other words, the meaning is what a reasonably prudent layperson would attach to the terms. *Pacific Indemnity Co.,* 302 Md. at 388, 488 A.2d 486.

If a term could support more than one reasonable meaning, the term is ambiguous. *Scherr,* 101 Md.App. at 695, 647 A.2d 1297. If the terms are ambiguous, the court must look to discover the intent of the parties when the contract was made. *Lawyers Title Ins. Corp. v. Knopf, et al.,* 109 Md.App. 134, 148, 674 A.2d 65 (1996) (citing *Hardy v. Brookhart,* 259 Md. 317, 326–327, 270 A.2d 119 (1970)). Although, insurance contracts are not to be strongly construed against the insurer, *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135 (1989), ambiguous contract terms are construed against the drafter. *Scherr,* 101 Md.App. at 695, 647 A.2d 1297.

Contract interpretation is a question of law subject to de novo review. *Weichert Co. of Md. v. Faust,* 419 Md. 306, 317, 19 A.3d 393 (2011) (quoting *Nova Research, Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448, 952 A.2d 275 (2008)). The application of law to fact creates, in this case, a mixed question, which is also reviewed de novo. *Liddy v. Lamone,* 398 Md. 233, 919 A.2d 1276, (2007) (citing *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000)). After reviewing the scope of Cambridge's agency under the agency agreement, we will address whether the title insurance policy effectively disclaimed the Partnership's ability to maintain an action in negligence regarding the title search.

### The Agency Agreement

The agency agreement unambiguously restricts Cambridge's authority to matters regarding the scope of title insurance. First, the agreement explicitly appoints Cambridge as an agent for Chicago Title "for the promoting and transacting of a title insurance business in the state of Maryland." Consistent with that purpose, the agreement permits the agent to "validate, countersign, issue and deliver commitments, policies and endorsements." The agreement does give Chicago Title the right to supervise and control certain aspects of Cambridge's work, but the enumerated duties relate to the issuance of title insurance. For example, Cambridge was obligated to "[r]eview and process applications for title insurance in a timely, prudent and ethical manner," "[p]repare, maintain and preserve a file for each application for title insurance" and provide Chicago Title with "a copy of each policy and endorsement issued by" Cambridge. In addition, Chicago Title reserved the right to review Cambridge's records and files as they related "to the business carried on hereunder and to the closing of transactions committed to the issuance of [Chicago Title's] policies and insurance."

The trial court found significant a provision in the agency agreement that indemnified Chicago Title against liability caused by "[e]rrors and/or omissions in the abstracting or examination of title by [Cambridge]." It appears that the trial court construed this provision as an acknowledgment that "a third party has rights against a principal based upon the negligence of the agent." We do not agree.

As we have discussed, the insurer's liability to the insured is governed by the terms of the policy and does not turn on whether a covered defect could have been reasonably located. It is obvious, however, that a title insurer would want to exclude a defect clearly shown on the public record from coverage. Rather than an acknowledgment of liability to a third party for an agent's negligence outside the terms of the policy, the provision indemnifying Chicago Title for errors in abstracting and examining title affirms that the title search

was for the benefit of the insurer and reimburses the insurer for insured losses that could have been excluded from coverage based on an accurate title search.

*The Title Insurance Policy*

As a general rule, the extent and scope of liability of an insurer is determined by the insurance policy itself. An insurance company that underwrites specific coverage "should not subsequently be expected to assume liability for a risk which it expressly excluded." *Matta v. Government Employees Ins. Co.,* 119 Md.App. 334, 705 A.2d 29 (1998) (quoting *Parker v. State Farm Mut. Auto. Ins. Co.,* 263 Md. 206, 216, 282 A.2d 503 (1971)). *See Eureka–Maryland Assur. Corp. v. Samuel, et al.,* 191 Md. 603, 609–610, 62 A.2d 622 (1948). Any clause in an insurance contract restricting liability or coverage will be held enforceable unless contrary to "the public policy of this State, as set forth in . . . the Insurance Code" or another statute. *Jennings v. Government Employees Ins. Co.,* 302 Md. 352, 488 A.2d 166 (1985) (quoting *Guardian Life Ins. v. Ins. Comm'r,* 293 Md. 629, 643, 446 A.2d 1140 (1982)).

The Partnership contends that this is not a title insurance case, but we are persuaded that an insurer's liability for a faulty title search ordinarily cannot be divorced from the title insurance policy. In *Lewis v. Long & Foster Real Estate, Inc.,* 85 Md.App. 754, 764, 584 A.2d 1325 (1991), we cited *Red Lobster Inns of America, Inc. v. Lawyers Title Ins. Corp.,* 656 F.2d 381 (8th Cir.1981), where the court recognized the title insurer could limit its liability through the title insurance policy. Ultimately, the court in *Red Lobster Inns* found that the title insurer's liability was not limited to the policy because a separate contract was entered into between the parties where the title insurer agreed to undertake the disputed action. *Red Lobster Inns,* 656 F.2d at 384.

*First Federal Savings and Loan Ass'n of Fargo, N.D. v. Transamerica Title Ins. Co.,* 19 F.3d 528 (10th Cir.1994), cited in *West,* 110 Md.App. at 131, 676 A.2d 953, reinforces this position. There, the court concluded that a title insurer could

place reasonable restrictions on an insured's ability to bring suit on matters related to the title insurance policy and define the scope of an insurer's liability, consistent with general principles of insurance law. *Id.* at 531 (citing *Behen v. Transamerica Title Ins. Co.*, 531 P.2d 641, 642–43 (Colo.App. 1974)).

Guided by these principles, we will examine the Safeco policy[17] to determine (1) the coverage provided by the policy; (2) whether the policy disclaimed the risk; and (3) whether any disclaimer is legally effective. *See Ins. Co. of North America v. Aufenkamp*, 291 Md. 495, 502, 435 A.2d 774 (1981). If there is no coverage for the claimed loss, the insurer will not be responsible in the absence of a statute, regulation or public policy that requires such coverage.

The policy issued by Safeco is a personalized version of the standard form title insurance policy addressed in *West.* It states:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, SAFECO TITLE INSURANCE CORPORATION, a Maryland corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A [$7,395,000], and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:
>
> 1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

---

**17.** The record contains the December 18, 1986 Policy of Title Insurance issued by Safeco, but not the October 14, 1986 policy issued by Chicago Title. Again, because title insurance policies are fairly standardized throughout the industry, James Bruce Davis, *More Than They Bargained For: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects?*, 45 Cath. U.L.Rev. 71, 77 (1995), we will assume that the policy issued by Safeco and the policy issued by Chicago Title are substantially similar.

2. Any defect in or lien on encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title.

Although, the policy agrees to indemnify the insured for such losses, the policy did not guarantee title was without defect, *West,* 110 Md.App. at 131, 676 A.2d 953, or that the exclusions listed in Schedule B represent all defects disclosed in the public record.

Any preliminary commitment issued on behalf of Safeco and countersigned by Columbia relates only to the issuance of a title insurance policy. It is not a title abstract or independent title opinion for which the title insurer would be liable outside the terms of its policy. Therefore, we are persuaded that both policies and any binders would put the Partnership on notice that the Title Companies were agents of Safeco or Chicago Title only for the issuance of title insurance and did not confer actual or apparent authority on the Title Companies to provide the Partnership with a separate guarantee of title for which the insurer would be responsible.

The express exclusions in the Safeco policy support this conclusion. For example, the title insurance policy excludes coverage for any defect, lien or encumbrance "not known to [Safeco] and not shown by the public records but known to the insured." This provision recognizes the possibility of defects that are either only known to the insured or unknown by Safeco and the Partnership and undocumented in the public records. In addition, the policy limits recovery to losses incurred while the Partnership owns the property. A condition of the policy states that coverage continues only so "long as [the] insured retains an estate or interest in the land . . . or so long as the insured shall have liability by reason of covenants or warranty made by such insured in any transfer or conveyance of such estate or interest." That provision extends title protection only for the period that the insured owns or purports to own an interest in the land in the absence of a general warranty of title to its grantees. *See Chicago Title Ins. Co. v. 100 Inv. L.P.,* 355 F.3d 759, 763 (4th Cir.2004)

(interpreting the Safeco title insurance policy issued by Columbia).

The Safeco policy provided coverage for the negligently performed title search in this case, but liability is expressly limited to the terms of the policy:

12. Liability Limited to this Policy

This instrument together with all endorsements and other instruments, if any, attached hereto by [Safeco] is the entire policy and contract between the insured and the Company.

*Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest covered hereby or any action asserting such claim, shall be restricted to the provisions and conditions and stipulations of this policy.*

No amendment of or endorsement to this policy can be made except by writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, Assistant Secretary, or [ ] officer or authorized signatory of the Company.

(Emphasis added.)

In its amended complaint, the Partnership asserts that the Title Companies' failure to perform a reasonably prudent title search and discover the Khan Deed caused loss or damage amounting to $191,510.88. Clearly, that claimed loss "arises out of the status of the title to the estate," and as such, is "restricted to the provisions and conditions and stipulations of this policy," unless a statute, regulation or public policy requires a different result.

To permit an insured to sidestep the policy limitations through a claim of vicarious liability undermines the contractual agreement and potentially title insurance in general. As one commentator explains:

The negligence remedy divorces the amount of risk a title insurance company assumes from the amount of premium it collects. If tort claims are allowed, the insured may recover all damages proximately caused by the title insurance company's negligence, even if those damages greatly exceed the policy amount on which the title insurance company based

its premium. As a result of the increased risk, title insurance companies must necessarily increase their loss reserves, perhaps to the point of having unfounded liabilities, and may need to charge higher premiums to fund this increased risk retroactively. By decreasing the predictability of losses, which provides the foundation of a safe and sound title insurance industry, a tort remedy actually works against the societal interest of assuring real estate titles.

James Bruce Davis, *More Than They Bargained For: Are Title Insurance Companies Liable in Tort for Undisclosed Title Defects?*, 45 Cath. U.L.Rev. 71, 102 (1995)

The Partnership's complaint parallels the claims against the title insurer in West, in which we rejected an attempt to convert a title insurance policy into a guarantee of title. *West,* 110 Md.App. at 131, 676 A.2d 953. To disregard the policy and permit an action in tort against the insurer for the negligence of the Title Companies would, in our view, overrule the *West* rationale, which we are not persuaded to do on the facts of this case. Because of the essential and now primary role that title insurance plays in the purchase and sale of real estate and the shift from title reporting to title insurance to protect both purchasers and lenders, a sea change of this magnitude with the risk of unintended consequences would be better handled by the legislature and regulatory branches of government after appropriate study and hearings. As of now, enforcing the title insurance policy as written does not conflict with any statute or regulation in Maryland, to which we have been directed.

In sum, we conclude that the Partnership cannot hold Chicago Title vicariously liable for any negligence of the Title Companies related to the status of title to the Parcel. The insurer's liability is limited to the terms of its policy.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED.**[18]

**COSTS TO BE PAID BY APPELLEE.**

---

**18.** Judge Kehoe did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8–605.1

MEREDITH, J., dissenting.

Although I agree with the majority's conclusion that the title insurer is not vicariously liable on a respondent superior basis for the negligence of the title companies in failing to note that the property that was the subject of this transaction had been previously conveyed to another purchaser, I do not agree that the appellees had no cause of action in tort against the title companies for their negligent title services. I would affirm the judgments entered against Cambridge Title and Columbia Title.

When a contract purchaser of real property engages a title company to conduct settlement on the contract, the most fundamental aspect of that engagement is, in the typical case, the need for a real estate professional to confirm that the seller has good and marketable title to the property that is to be conveyed. Although most contract purchasers do not know the intricate details of what a proper title search and proper conveyancing require, the typical purchaser of real estate expects, at a minimum, that the title company will (1) confirm that the seller holds good and marketable title, and (2) prepare a deed that transfers good and marketable title to the purchaser. The typical purchaser also expects that the purchase price would not be paid if the title search discloses that the seller does not even own the subject property because the seller has previously conveyed to another grantee all of the seller's title in the subject property. Although it is possible to vary the terms of a title company's engagement by contract, the evidence in the present case did not persuade the trial judge that the purchasers of the subject property expressly contracted for limited services from either Cambridge Title or Columbia Title.

Despite the undisputed fact that the sellers' prior conveyance of the subject property was properly recorded and indexed in the land records, and despite the undisputed fact that a competent title search would have discovered the sellers' prior conveyance, the majority opinion holds that the appellees had no cause of action in negligence against the title

companies to recover the pecuniary damages caused by the negligence of Cambridge Title and Columbia Title in conducting the closings. In my view, the judgments entered against the title companies by the circuit court were proper and should be affirmed.

The majority opinion acknowledges that the Court of Appeals has noted on several occasions that a claim asserting negligence on the part of a title company is " 'ordinarily enforced by an action of case for negligence.' " *Corcoran v. Abstract & Title Company*, 217 Md. 633, 637, 143 A.2d 808 (1958) (quoting *Watson v. Calvert Bldg. & Loan Ass'n*, 91 Md. 25, 33, 45 A. 879 (1900)). *Accord Stone v. Chicago Title Insurance Co.*, 330 Md. 329, 336, 624 A.2d 496 (1993). The majority opinion nevertheless concludes that a victim's recovery for the negligence of a title company is limited to an action in contract because the cases just cited also point out that, although the claims are "ordinarily" asserted as causes of action for negligence in Maryland, the liability is analytically contractual in nature. *Id.* But the same analysis would apply to claims of professional negligence asserted against doctors and lawyers, and we clearly would not hold that there can be no recovery in tort for damages caused by the incompetence of those professionals.

Professors Dobbs, Hayden, and Bublick explain in their treatise that even states which limit tort actions for negligent performance of a contract generally permit recovery in tort for economic losses caused by the negligent services of a professional. In 3 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS (2d ed. 2011), § 615 at 494–95, the authors state:

> *Actions for certain negligent services permitted; attorneys and "professionals."* Application of the economic loss rule to services seems consistent with the policy behind the rule, but it opens up a new problem. Courts continue to permit negligence actions by clients against such service providers as attorneys, accountants, insurance brokers, notaries and and [sic] sometimes even title insurers who perform a negligent title search. On the other hand, the

economic loss rule often protects other providers of services, such as building contractors, against liability for their negligence. Some courts have sought to explain the uneven treatment of service providers by saying that the economic loss rules does not apply to bar negligence actions against defendants who are professionals, or defendants who are in a special relationship with the plaintiff, or those whose contract obligation does not include production or delivery of a tangible object. It may be that all of these efforts to describe the exception are heuristics—pragmatic short-cuts that might usually but not always coincide with a principled exception. Perhaps the overriding principle is that defendants who, like attorneys, are in a special relationship with the plaintiff, or who contract to foster the plaintiff's interests and who are not contracting as adversarial bargainers or competitors, should be subject to the duties of care imposed by negligence law. That would explain the cases and offer a realistic basis for judicial decision-making.

(Footnotes omitted.)

Such liability in tort for malpractice is not limited to doctors and lawyers, but extends to professionals providing paralegal information services, such as the title companies did in this case. Because the services that were negligently provided by the title companies in this case—*viz.*, examining title and preparing a deed of conveyance—were services that have historically been performed by attorneys, the title companies should be held to the same duty of care that would have applied if the appellees had hired a licensed attorney to provide those services.

Moreover, a cause of action in negligence against the title companies is supported by RESTATEMENT (SECOND) OF TORTS, § 552 (1977), which recognizes liability for a business person who negligently provides false information for the guidance of others, which is what both of the title companies did in this case. Section 552 reads as follows:

**§ 552 Information Negligently Supplied for the Guidance of Others**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

 (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

 (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

In my view, the trial judge analyzed this case properly. At the conclusion of the bench trial, the judge summarized her findings and conclusions as to the title companies as follows:

It is clear that if someone undertakes the examination of a title for compensation, a reasonable degree of skill and diligence in doing so is required. *Corcoran v. Abstract and Title Company of Maryland, Inc.*, 217 Md. 633, 637, 143 A.2d 808 (1958); *see Canatella v. Davis*, 264 Md. 190, 286 A.2d 122 (1972). The testimony and evidence presented at the trial was sufficient to establish that Cambridge and Columbia Title were engaged by the Partnership to perform all the duties expected of a title company in connection with the purchase of land in a commercial real estate transaction.

The defense argues that although the Plaintiff based its claims on a negligence theory, the claims are—in reality—

an action for breach of contract. The defense further argues that, in that case, there can be no liability on the part of Chicago Title.

In the case of *Myerberg, Sawyer & Rue, P.A.* [*v. Agee* ], [51 Md.App. 711, 446 A.2d 69 (1982),] a law firm was hired to search title for the purchasers of real estate and, in doing so, failed to detect in its title search that there was no right of ingress and egress to the parcel to be purchased. The purchasers cured the defect themselves and then filed suit against the law firm. Though the case was technically a breach of contract action, the central issue was the foresee-ability of the purchaser's damages. Maryland case law has made clear that the foreseeability of damages test is the same for contract actions and negligence actions. *See Stone v. Chicago Title Insurance Company of Maryland,* 330 Md. 329, 624 A.2d 496 (1993); and *Reamer v. Kessler,* 233 Md. 311, 196 A.2d 896 (1964).

The first issue the court needs to address is whether the Title Companies could reasonably foresee that the Partner-ship would certify to Howard County that it owned the Disputed Tract and that Howard County would permit the sale of subdivided lots based upon that certification. The Court finds that such a result would have been foreseeable in that the Title Companies could reasonably foresee that the Partnership would certify to Howard County that it owned the Disputed Tract, as there was nothing in the title work that was done to indicate otherwise. It further follows that it was foreseeable that the Partnership would convey the subdivided lots based on the certification.

The second question becomes whether the Title Compa-nies could foresee the consequences that would flow from that false certification. Analysis of foreseeability in the proximate cause context turns on whether the actual harm falls within a "general field of danger." *Stone,* 330 Md. at 337, 624 A.2d 496.

It was certainly foreseeable that the Title Companies would have known that the Partnership would rely on their title search. Although the Partnership conveyed the lots in

the Disputed Tract prior to the double conveyance being discovered, it is also foreseeable that as a result of the negligence in failing to discover the ti[t]le defect, damages would be incurred to correct the title defect before future conveyances of the Disputed Tract could be made.

It is also foreseeable that, in reliance on the title search, the Partnership would be granting utility easements and, if the information in the title search was incorrect, the certification of ownership would be false and the public utility easement would be invalid.

The Partnership's response when it learned of the defective title issue should also have been foreseeable as the Partnership's response was predictable. Faced with the possibility of costly litigation, it makes sense—and it was foreseeable—that the Partnership would repurchase the Disputed Tract to resolve the problem. The price paid was precisely the per acre price being paid by Timbers for the rest of the tract. It is foreseeable that this would be the price tag for resolving the problem. It is further foreseeable that the Partnership would incur closing costs and attorney's fees to consummate this transaction. All of these costs and expenses were in the "general field of danger," as defined by the *Stone* case.

If the Partnership did not proceed in this manner and elected to simply do nothing, it is entirely foreseeable that the damages would have been far greater in defending the litigation that would have certainly been—and was, to some degree—instituted. It is also foreseeable that the Partnership would have faced administrative and civil penalties assessed by the County as a result of the false certification. *See, e.g.,* Howard County Code, §§ 16.106, 24.102, 24.103, 24.106 and 24.107.

There is no dispute that the Disputed Tract was conveyed twice and this fact went undiscovered for approximately 15 years. It is also undisputed that the Partnership suffered an economic injury. Specifically, the Partnership repurchased the Disputed Tract (for $175,348.56) and incurred closing costs and attorney's fees in addition thereto. The

Court finds that the economic injury was proximately caused by the Title Companies' breach of the duty of care they owed to the Partnership.

Because the trial judge's findings of fact were not clearly erroneous, I would affirm the judgments that were entered against Columbia Title and Cambridge Title.

Alternatively, I note that the appellees included in their amended complaint a breach of contract count against Columbia Title. Even if the appellees' claims were limited to claims for breach of contract, they should have been permitted to recover against Columbia Title on the contract count.